**UNITED STATES of America, Plaintiff,**

v.

**WESTCHESTER FIRE INSURANCE CO. OF NEW YORK, Defendant.**

United States District Court
S. D. New York.
March 22, 1957.

Paul W. Williams, U. S. Atty. for Southern District of New York, New York City, Foster Bam, Asst. U. S. Atty., New York City, of counsel, for plaintiff.

Bigham, Englar, Jones & Houston, New York City, Daniel A. Sullivan, New York City, of counsel, for defendant.

KNOX, District Judge.

This suit was begun on July 21, 1951, almost six years after the occurrence of the events on which it is founded. Defendant answered the complaint on September 5, 1951. A discontinuance was entered on December 30, 1955, and vacated on February 15, 1956. Trial was had in the following November, slightly more than eleven years after the alleged cause of action accrued.

But, whatever the reasons for delay, the result is most unfortunate. The Court is without the aid of a word of oral testimony as to the condition of the cargo, either before, or at, the time it was placed aboard the motor vessel, Sheet Bend, owned by the War Shipping Administration, in September, 1945.

As respects these important matters, the only items of evidence are these:

(1) A copy of a "Grace Line, Agent" bill of lading with a notation thereon "War Shiplading. 7–1–42." The shipper was W. R. Grace & Co., on behalf of the Commodity Credit Corporation, and the cargo, consisting of 94,223 bags of refined sugar, was consigned to the order of the Commodity Credit Corporation, 150 Broadway, New York, N. Y. Houston, Texas, was the destination of the goods.

This document was dated at Salaverry, Peru, September 18, 1945, and was signed "For the Master, by Grace Line, Inc., as agent for the Master, by R. P. Menees (the Master of the ship)." It also contained this memorandum:

"In accepting this bill of lading the shipper, consignee and owner of the goods agree to be bound by all of its stipulations, exceptions, and conditions, whether written, printed, or stamped on the front or back hereof, any local customs or privileges to the contrary notwithstanding.

"Grace Y Cia. (Peru)
Seccion Salaverry."

Such memorandum was signed by a person (whose name is undecipherable) as "Administrador".

The bill of lading recites that the goods had been received "in apparent good order and condition", with the exception that "18 bags [were] lost overboard" in loading the vessel.

(2) The bridge log book of the ship; and

(3) A letter of protest by the Master, which reads:

"S/S Sheet Bend
Salaverry, Peru.
September 18, 1945

"Grace Y. Cia.
Seccion, Peru.
Salaverry, Peru.

"Dear Sirs:

"During the course of loading cargo 4250 tons refined sugar, September 13, 1945, to September 18, 1945, at Salaverry, Peru, the following exceptions have been noted:

"1. 1% of bags found to be wet or in a damp condition.

"2. 2% of bags found to be in bad order or torn.

"3. Hatches were not closed at night, resulting in the top layer of bags to be found in a damp condition each morning. Hatches were left open against the instructions of Officer on duty.

"4. Although ship provided enough dunnage, no dunnage was used over side cleats or sweat battens as requested by Officer.

"Yours very truly,
(sgd)    Robert P. Menees
Master

"I hereby acknowledge receipt of the original exception noted.

"S. Biggs, Agent
Grace Y. Cia
Salaverry, Peru."

These documents were introduced into evidence under the provisions of Title 28 U.S.C.A. § 1733. Others, bearing upon the loss sustained by the United States, were also admitted by virtue of said statute. The reception in evidence of the bill of lading, and some other gov-

ernmental exhibits, was vigorously opposed by the defendant.

The loading of the ship was completed on September 18, 1945, and it is inferable that the bill of lading and the master's protest were simultaneously delivered to Grace Y. Cia.

The other facts, so far as shown, are substantially these:

On September 13, 1945, the Sheet Bend, as she lay in the stream at Salaverry, began taking the cargo on board from lighters, alongside the ship.

In view of what occurred in course of loading, the entries in the log book, in reference thereto, should be set forth. They are:

"September 13, 1945

12.05 Riggers aboard, rigging up for loading.

12.45 Stevedores aboard. Opening hatches.

13.50 #1 hatch open.

16.22 Began loading #1, and loading ship.

17.35 Began loading #2 hold.

18.45 Start opening #3 hatch, laying dunnage #3 hold.

24.00 Stevedores away, insisting on leaving hatches open over 2nd Mate's protest.

(1) 10 sacks sugar #1 broken from dropping a sling load. Rejected by ch. officer, but sent back aboard by agents.

(2) 8 sacks sugar #1 H torn rough handling by stevedores.

(3) 25 sacks sugar #2 H torn. Rough handling by stevedores.

(4) 10 sacks sugar #1 H were torn & R/S on delivery to vsl for loading.

(5) 12 sacks sugar #2 H were torn & R/S on delivery to vsl for loading.

September 14, 1945

(1) Stevedores failed to close hatches as per Deck Officer's request—Hatches found open at 0700.

(2) #1 hold—sacks torn on loading—resewn and loss negligible.

(3) #2 hold—11 sacks torn on loading recoopered—O. K.

(4) #3 hold—21 sacks torn while loading—recoopered—O. K.

(5) #3 hold—6 sacks in bad order—rejected.

(6) #2 hold—11 sacks in bad order—rejected.

(7) #2 hold—2 sacks in bad order—rejected.

(8) #3 hold—6 sacks torn, while loading recoopered O. K. All rejected sacks retained on board by order of Grace agents.

September 15, 1945

(1) All hatches left open by stevedores against advice of officer on watch—top layer of bags on all holds found in a damp condition.

(2) #2 hold 12 sacks broken while loading—rejected. All bags rejected. All bags rejected retained on board by orders of Grace's agent.

(3) #3 hold—14 bags torn—recoopered.

(4) #4—2 sacks broken up—all contents lost.

(5) #2 H—8 sacks broken & R/S part of contents lost.

(6) #3 H—15 sacks broken R/S part of contents lost.

(7) #4 H—5 sacks sugar broken. 1 sack completely lost due to stevedores loading with boom too low, slings catching on obstructions in hatch. Stevedores refusing to raise boom on 2nd officer's advice.

September 16, 1945

(1) All hatches found open—the Longshoremen having refused to close them at the Deck Officer's Request—Top layer of sacks on all holds found damp—

(2) #4 hold—15 bags broken whole loading—rejected.

(3) #2 hold 7 sacks torn while loading—rejected.

(4) #3 T/D—bags torn due to rough handling of stevedores —50% of sugar spilled— sacks rejected. All rejected bags retained on board by orders of Grace's agent.

September 17, 1945

(1) All hatches found open— stevedores having refused to close same as requested by officer on Deck.

(2) Top layer of sacks in #1-2-3 holds & T/D found damp due to having been exposed to weather over night.

(3) #3 T/D—18 sacks broken— rejected.

(4) #2 T/D—13 sacks in B/O— rejected. All rejected bags retained on board by order of Grace's agent.

September 18, 1945

(1) Hatches found open due to longshoremen refusing to close hatches—top layer of bags damp—

(2) #2 T/D.

(3) 17 bags lost overboard on #2 hold. Fault of Steved.

(4) All rejected bags sent back to the ship by Grace Agent."

The proof further shows that, upon July 14, 1945, defendant issued a marine cargo insurance policy, covering "all shipments of Peruvian Raw Sugar * * which the Commodity Credit Corporation instructs Compania Agricola Carabayllo &/or W. R. Grace & Co. to insure."

The policy provided that it was to attach from the time the goods left the warehouse and/or store at the places where the assured's liability commenced and continue during the ordinary course of transit until the goods were discharged overside from the overseas vessel at the final port. Thereafter, the insurance was to cover the goods while in transit to final warehouse, etc.

One of the clauses in the policy, as originally written, reads:

"Warranted by the insured, free from damage or injury from dampness, change of flavor, or being spotted, discolored, musty or mouldy, except caused by actual contact of sea water with the articles damaged by sea perils * * *."

On September 6, 1945, the policy was extended to cover:

"Under Deck shipments of Refined Sugar (including bags containing same).

"* * * including loss or damage due to contact with fresh water, other cargo, oil and/or coal, fuel oil, sweat and/or steam of hold.

"Including loss of bags in loading or unloading. * * *."

Defendant denies that it was under any liability upon the policy.

Following the trial, and after my examination of plaintiff's exhibits, I felt that, due to war conditions existing at the time of shipment, the responsibility for loading the vessel may have rested upon W. R. Grace & Company, and not upon the master. Consequently, on January 11, 1957, at a conference with counsel for each of the parties, I made inquiry as to this phase of the case.

Under date of January 16, 1957, the Assistant United States Attorney who tried the case for the plaintiff, wrote me a letter, in which he said:

"* * * I am sorry to report that I have been unable to obtain additional information. I have re-examined my entire file * * * and I have also telephoned the Department of Agriculture * * * but I have not found anything that would indicate who had the responsibility of loading the vessel in Peru, or who hired the stevedores * *."

The master of the ship, I am told, cannot be found. Moreover, as already stated, the plaintiff did not call, or take the deposition of, any witness who had knowledge of the facts concerning the

acquisition and handling of the cargo, at or before it was put on board the vessel. Still further, there is no direct proof as to the nature and extent of the agency arrangement between the shipper-consignee and W. R. Grace & Co.

On the outturn of the sugar at Houston, it was found to be severely damaged. According to a compilation made by representatives of Shilstone Testing Laboratory, Inc., at Houston, the breakdown of the sacks which they examined is this:

| | |
|---|---|
| Dry full bags | 968 |
| Dry slack bags | 1172 |
| Damp full bags | 5636 |
| Damp slack bags | 341 |
| Sweepings (bags) | 60 |

Thereafter, it was found that there were 68, instead of 60, bags of sweepings.

The Commodity Credit Corporation opened negotiations to sell the damaged cargo, and, in early January, 1946, a sale was consummated with Imperial Sugar Company, of Sugarland, Texas. The purchaser took 8,097 bags of sugar, plus 68 bags of rebagged sweepings, at a price of .0428 cents per pound. Defendant approved the price and terms of sale, without prejudice to any rights to which it might be entitled.

The Government asserts that, although the sugar sold as aforesaid should have weighed 816,500 pounds, the actual weight was only 764,108 pounds, and that, thereby, the loss to the United States was 52,392 pounds.

The Government seeks recovery from the defendant of the difference between the insured value of the sugar and the sales price, loss of poundage, plus storage charges, and watchmen's services, during the time that the sugar in controversy was in a warehouse at Houston. In the aggregate, the damages claimed amount to $13,775.72 with interest.

Upon the trial, the plaintiff called Merle W. Allen as an expert witness. He is a former master mariner, now engaged in surveying cargoes and vessel hulls, and acting as a consultant on shipping problems. He is conversant with the sugar trade, and familiar with weather conditions that ordinarily prevail in Salaverry, during the month of September.

Captain Allen was never on board the Sheet Bend. Nor did he, at any time, see the cargo she had carried. His knowledge of the situation was limited to his own experience, a study of the vessel's log, the master's letter of protest, and the depositions of Messrs. Hancock and Shilstone of Shilstone Testing Laboratory, Inc., who inspected bags of sugar which had been set aside, and characterized as "good" and "bad".

From information appearing in the Sheet Bend's log, Captain Allen said that the vessel "is an Emergency Construction ship, three hatches forward, and one hatch aft, having a beam of 50 feet, and a length of approximately 320 feet between perpendiculars * * *."

In Salaverry, in the month of September, the average temperature ranges from 60 to 72 degrees. Evening mists and morning fogs are usual, and many times, the sky is overcast. The witness said that it is good practice, and usual procedure, for a ship, loading cargo at Salaverry, in that month, to cover its hatches at the close of stowage of cargo for the day. This is definitely so when a shipment is composed of refined sugar.

Such sugar is susceptible to moisture and contamination; it is also subject to loss through the tearing of the outer packaging of the bags. If there is a slight moisture content there will be a caking and hardening of the sugar. If there is a fair amount of moisture, the sugar will tend to melt and to run.

Ships of the type of the Sheet Bend are equipped with pontoon hatch covers on all hatches. In an extreme emergency, hatches have been closed by one man, but, customarily, two men are employed. During the loading, according to the log, two men were on night duty.

As an alternative to closing hatches, squall tents are sometimes used, and they can be hoisted * * * and secured by

one man. Such tents are put in place by the up and down fall, and are in the shape of a pyramid.

In the opinion of the witness, any ship's officer, or master, who found a damp condition of sugar bags on one morning during loading, would certainly have covered the hatches to guard against it on future occasions. Seven hours elapsed between the time at which the stevedores knocked off for a night, and their resumption of loading, the following morning. During the loading period, in this instance, the weather conditions varied from "fair, and very misty" to "overcast and hazy skies."

The witness thought the moisture content of bags of sugar with a burlap cover, and the customary secondary bag within, due to their exposure at night, would be slight. The penetration of such moisture content into the bags would be less than half an inch. He also said he did not believe that a damp sack, which had acquired moisture from night dews or mists, would transmit the same to more than one sack which was placed on top of it. In very rare cases, a damp sack could transfer moisture to three additional sacks. It would take quite a bit of moisture to go through the outer cover to the inner wrapper, particularly in this case. Any such penetration would be doubtful.

The witness described the nature and purpose of cargo dunnage, saying that if it had not been used, as set forth in the protest of Captain Menees, one could expect that, in the ocean transit, sweat damage would develop. This, inasmuch as some bags of sugar would be in direct contact with the ship's shell plates, or other metal parts.

Lack of proper dunnage, furthermore, would cause bags of sugar to be stained, and their contents to melt, with resultant loss of weight.

After considering all the matters brought to his attention, Captain Allen believed that the matters thus shown, together with possible "preshipment wetting" would be productive of sweat, or steam, in the vessel's holds. And, also,

that the bags of sugar which were dampened in the course of loading, would tend on occasion to "self sweat themselves". The witness added that, from the master's protest, he believed that the ship was provided with sweat battens.

The testimony of the witness extends considerably beyond the portions thereof that have been recited. But, basically, there is little, if any, modification of the substance of what has been set forth.

Upon the conclusion of Captain Allen's evidence, and after having introduced the depositions of Messrs. Shilstone and Hancock, of the Shilstone Testing Laboratory, Inc., the Government rested its case. Defendant then moved for a dismissal of the complaint. The motion was taken under advisement.

At this point, a log entry, under date of September 30th, and made shortly after the vessel's arrival at Houston, is of passing interest. It reads, "Cargo inspected by Ch. Officer upon opening of hatches and found dry and in good condition." Such officer was not called as a witness.

Following the close of plaintiff's case, defendant called Robert Lowry Wynne to the stand.

Mr. Wynne is a ship surveyor, in charge of the National Cargo Bureau, for the area between the Mississippi and Rio Grande Rivers, including the coastal area of Texas.

Between 1920 and 1928, this witness was a licensed master of ocean going vessels. Since the year last mentioned, his vocation had been that of a surveyor. He is also a lawyer, and admitted to the Bar of Texas. He has made numerous surveys of sugar cargoes.

After the arrival of the Sheet Bend at Houston, on the voyage here concerned, this witness, on behalf of Appleton & Cox, marine underwriters, went on board the vessel. He entered each of her holds, looking for sweat damage. He observed that dunnage had been placed over the sweat battens, and elsewhere, in the cargo compartments. Damp bags of sugar were found at random throughout the

cargo, principally, in the hatchways. He saw no evidence of sweat stains. Such stains, if bags had been placed against a rusty side of a ship, would have a brownish appearance. Bags on the top of a sweated stow will disclose evidence of water having dripped upon them. No indication of a melting of the sugar was seen. The witness first went aboard the vessel on October 4, 1945.

In an examination of the ship's log, Captain Wynne discovered nothing that would indicate the presence of a sweat condition in the holds.

When asked if the moisture in bags of the sugar, occasioned by failure to close the ship's hatches at nights during the loading operations at Salaverry, was the cause of the wet bags that were found at the time of discharge, he answered:

"I would say that it is indicative of it. I don't know that to be the fact."

A summary of discharge records, made at Houston, reveals that on October 3, a little less than one half of the entire cargo had been removed from the vessel, and that none of it, in No. 4 hold, had been unloaded.

The recollection of the witness as to what occurred at Houston, ten or more years ago, was somewhat hazy. Nevertheless, he said he was certain that he had been on the ship on more than one day, and that (and in contradiction to item (3) of the master's protest) he found dunnage down the sides of the battens, against the columns, stanchions; and, after the cargo was fully discharged, on the floors of the holds.

Following his inspection of the damaged bags of sugar, and after his receipt of analyses of the contents of the sugar in such bags, and which had been made by persons selected by Shilstone Testing Laboratory, Inc., Captain Wynne made a written report to Appleton & Cox.

Upon interrogation concerning his report, portions thereof were read into the record. Its conclusion is:

"After taking into consideration the condition of the cargo on arrival,

careful consideration of the vessel's holds and the cargo in stowage, and from conversation with officers of the vessel, it is the opinion of the undersigned surveyor that damage to the cargo is due to the hatches not being covered when loading was discontinued for the day, dampness entering the vessel's holds, wetting some of the bags; these bags which had been wet wetted other bags adjacent to them during the voyage. Reference is made to the letter of September 18th, addressed to the shipper, by the Master, in which it is stated that one percent of the bags were found to be wet and in a damp condition due to the hatches not being closed at night.

"My examination of the cargo stowed in the holds indicated that dunnage was used, although in my opinion, not as freely as it could have been used. However, this in itself seems immaterial since my further examination definitely indicates that the damage was not due to sweat, but due to the bags having been loaded in a very humid and damp atmospheric condition; the hatches being left open at night, causing the bags to become very damp, and subsequently damaging others adjacent to them during the voyage."

The result of an examination of the sugar, which was made by H. M. Shilstone, Jr., a civil engineer, and Managing Director of Shilstone Testing Laboratory, Inc., on October 16, 1945, and after they had been warehoused at Houston, is to this effect:

"The bags were stacked in four piles, two of which were said to contain sugar which had been termed 'good' and two to contain bags generally classed as 'bad' * * *.

"The good bags were of clean and dry appearance, and the sugar contained therein was dry and loose. The 'bad' bags were damp and discolored, and contained sugar which was lumpy and damp.

"Samples were taken from a representative number of 'good' and 'bad' bags, from which composites were made, and submitted to chemical analyses.

"Tests

| Tests | 'Good' Sample | 'Bad' Sample |
|---|---|---|
| Moisture | 0.049% | 2.31% |
| Reducing Sugars | 0.018% | 6.50% |
| Sucrose and ash (by difference) | 99.933% | 91.19% |

"Notes:  Ash is negligible

Both samples were clean and white.

The sample of 'bad' sugar had inverted.

"It is our opinion that the inversion found to be present in the 'bad' sample is due to the presence of moisture combined with the action of heat. Had the deterioration been caused by exceptional age, the sugar would evidence a rancid odor, and the 'good' sample would be similar to the 'bad', provided all bags were of the same original lot."

Charles K. Hancock, a chemist, also connected with Shilstone Testing Laboratory, Inc., examined samples of the sugar on November 9, 1945, at which time many of the bags of sugar were still wet. Among conclusions, in his report, is the following statement:

"On the basis of information received * * * regarding the storage and handling of this shipment, and by the results of the chemical examination of the sugar and the visual examination of the bags * * the moisture damage is due to atmospheric conditions, either at the point of loading, or while the sugar shipment was in transit * * * although the undersigned had no means of knowing whether the bags became wet by direct contact with water, the nature and extent of the moisture found in the sugar, and in the bags, gives direct indication of condensation, or 'sweat' origin."

An entry in the ship's log on October 4, 1945, discloses that upon that day, a surveyor by the name of H. B. Lambdin, representing the Grace Line, as well as Captain Wynne, was on board the ship, inspecting the holds. Mr. Lambdin was not called as a witness. No reason for the absence of his testimony was disclosed.

As bearing upon some of the problems of this litigation, it may be mentioned, from papers found in the Government's file [Defendant's Exhibit C], that upon October 2, 1945, Geo. J. Martin, of the Insurance and Claims Division of Lykes Bros. Steamship Co., Inc., Agents of the United States of America, War Shipping Administration, at New Orleans, addressed a letter to Grace Line, Inc., 416 Poydras Street, New Orleans, in which he said:

"Attention:  Captain Parker
SS 'Sheep(T) Bend'—
Discharging
Sugar at Houston

"We wish to confirm telephone conversation of today's date regarding subject matter, during which *you* advised the undersigned that sugar being discharged ex vessel at Houston, *for which you act as Berth Agents,* was outturning in a more or less poor condition by reason of the fact that the sugar apparently had been loaded in old bags that had been in storage over a long period of time." [Emphasis added.]

The letter went on to say that the local office of the vessel's underwriters, The United States P. & I. Agency, Inc., and their local manager advised * * * that "if the cargo was moving under bills of lading which indicated Government ownership (*as is the case here*), the vessel's P. & I. Underwriters would not be interested in whether or not the surveyor was called in to represent the vessel."

Neither Captain Parker, nor any other person connected with W. R. Grace & Co., was called as a witness.

On August 5, 1947, the New York office of the Commodity Credit Corporation addressed a letter to Appleton & Cox, Inc., which acknowledged receipt of the underwriter's decision to deny liability on the vessel's cargo, with the exception of the 18 bags which were lost overboard at Salaverry, on the ground that the damage claimed was not caused by a peril insured against. The payment for the loss of such bags, amounting to $82.19 was subsequently made.

Such letter contained this statement:

"We are, at present, in the process of developing additional information concerning the nature and cause of the damage, and shall contact you in this connection as soon as possible."

The result of such investigation, if ever made, has not been brought to my attention.

Owing to the paucity of plaintiff's evidence, the Court is without knowledge in respect to the following matters, which, in view of the time of the attachment of defendant's insurance coverage, are of some importance:

(1) The age and sufficiency of the bags in which the sugar was packed;

(2) The period, if any, over which the cargo has been in storage on shore;

(3) The place of storage;

(4) Whether such storage had been in the open, or in a warehouse, while awaiting shipment; and

(5) The state of the weather to which it may have been exposed before reaching the Sheet Bend.

Plaintiff argues earnestly, in view of the language used in Item (1) of the master's protest, that I should conclude that only 940 bags of sugar were originally dampened, and that they would have communicated their moisture to no more than an additional 940 bags. It is also urged that the degree of moisture was of a slight nature.

By way of reply to this argument, I may say that, in my judgment, the master's statement that one percent of the bags were "found to be wet or in a damp condition" was merely a guess, or at best, a rough estimate. Had he been examined orally, Item (1) of his protest, together with its other items, might have been clarified. This, regrettably, was not, or could not be done.

Upon this record, I know nothing about the pattern of stowage. However, it is conceivable that some of the bags may have been subjected to dampness on more than one occasion, and thus acquired additional moisture.

It is also to be recalled that lighters carried the sugar from on shore to the ship, and, in this movement of the cargo, one may surmise that portions of it were dampened in the same manner as were the bags on board the vessel.

But, even upon plaintiff's assumption that no more than 1880 bags were dampened in the process of loading, I should think such dampened bags, if shortly covered by other bags, would have had no opportunity to dry out, and soon thereafter, would begin to heat and, as Captain Allen said, "self sweat themselves".

The notations in the vessel's log book, the form and contents of the bill of lading, the letter of October 2, 1945, addressed to the Grace Line, Inc. (attention of Captain Parker), hereinbefore mentioned, and a consideration of the time element involved, tend to support my belief that the Grace Line, Inc., most likely an affiliate of W. R. Grace & Co., was berth agent for the ship at the South American port, from which the Sheet Bend sailed for Houston.

As was said in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, at page 797, 69 S.Ct. 1317, at page 1325, 93 L. Ed. 1692: "The duties of the berth agent relate primarily to the handling and loading of cargo and other port services such as wharfage and pilotage needed by the vessel." See 7 Fed.Reg. 7561; 8 Fed. Reg. 17512, and 1943 Supp., Titles 32–56, Code of Federal Regulations, page 2113. In this latter citation, the berth agent is definitely made the agent of the United States. See also: O'Maire, Inc., v. The

Yaka, D.C., 79 F.Supp. 659, and Jensen v. Matson Nav. Co., D.C., 71 F.Supp. 939.

The existence of such berth agency affords a reasonable explanation for the action of Grace Line, Inc., in taking over the full, complete and exclusive control of the loading of the Sheet Bend, and Captain Menees' failure to take an affirmative part in such operation. The responsibility for that task did not rest upon him, but upon the berth agent. Thus, it appears that W. R. Grace & Co., was agent of the shipper-consignee, and its affiliate, Grace Line, Inc., the agent of the United States.

■ The master's protest plainly disavows the statement in the bill of lading that the bags of sugar were in good order and condition when that document was issued. Indeed, it is evidence that the cargo had negligently been stowed. See, Katzenberg v. Lamport & Holt, D.C., 59 F.2d 739; affirmed 2 Cir., 64 F.2d 1014, and Jones Const. Co. v. Niagara Fire Ins. Co., 4 Cir., 170 F.2d 667.

■ The proof offered by the Government fails to show that the cargo, at the time of the attachment of the defendant's policy was in good order and condition. However, it does disclose that the casualty suffered by the goods, in the course of the Sheet Bend's voyage to Houston, was, in all reasonable probability, proximately caused by the negligence of the agent of the assured and/or that of the agent of the United States in stowing the cargo. The damage that was found on the outturn of the sugar was something which, under the circumstances, simply had to happen; consequently, the loss is not within any of the perils set forth in defendant's policy.

In Mullins' Insurance Digest (1951), at pages 12 and 13, under the heading, "All Risks" (which the policy in suit is not), the author says:

"There are several forms of 'all risks' clauses. The aim * * * is to cover the insured property against any unusual loss or damage suffered in transit. The normal loss to which certain commodities are subject is not covered nor is any loss due to the nature of the commodity itself * * *. A loss due to the fault of the assured in shipping goods in improper condition or improperly packed is not covered."

See, in addition, Carver's treatise on "Carriage of Goods by Sea", at page 467 (in its discussion of "Stowage"), where it is said:

"But the shipper will be estopped from complaining of a method of stowage which has been directed by him, and he may be estopped by merely assenting to it."

And, at page 468:

"* * * The authorities have been said 'to carry the law at least far enough to show that a shipper who takes an active interest in the stowage, and complains of some defects but makes no complaint of others which are patent to him, cannot be heard to complain of that to which he has made no objection.'"

"* * * The same is not true with regard to an indorsee of a bill of lading to whom the goods have passed, without notice of any agreement or act creating such an estoppel."

With the exception of the six bags which were lost, or partially lost, in the loading of the vessel at Salaverry, and for which the defendant has not made restitution (the amount of which can probably be agreed upon), relief to the plaintiff must be denied.

Judgment, as heretofore indicated, will be entered.