**Hubert N. SELBY, Jr., Libelant,**

v.

**UNITED STATES of America, Respondent.**

United States District Court
E. D. New York.

May 9, 1958.

Kupfer & Levine, New York City, for libelant, by Jacob Rassner, New York City, Advocate.

Cornelius W. Wickersham, Jr., U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., by Gay & Behrens, New York City, of counsel, Edward J. Behrens, New York City, Advocate.

BYERS, Chief Judge.

This libelant seeks a decree to recover damages in a Jones Act case, 46 U.S.C.A. § 688, because, as he alleges, of having been "exposed to contagion and illness" while serving as an oiler on the S. S. Rockland Victory (to be called Rockland) owned, managed, operated and controlled by the respondent.

It is understood from the libel, the testimony, and the briefs, that reliance is had upon the theory that libelant became tubercular on a voyage of the said ship which started in February, 1946, because of the negligence of the respondent in providing him with an unsafe place in which to work, and because the ship was unseaworthy as operated and maintained, for the transportation of horses and mules.

The libelant does not rely upon aggravation of an existing tubercular condition, either active or not, (as in Hiltz v. Atlantic, etc., 3 Cir., 151 F.2d 159) but upon the creation of conditions arising from the lack of care of the animals constituting the cargo, which had the effect of imparting vitality to what would otherwise have been only the mere dormant germs of the disease. The customary presence of such in persons of normal health is said to be a recognized condition.

■ If the Hiltz case and Hern v. Moran, 2 Cir., 138 F.2d 909 are understood, there is no difference between the duty of the ship towards its crew as to the aggravation of an existing condition on the one hand, and the causing to arise as a new thing a physical disability, on the other hand. The practical distinction goes merely to the award of damages.

Also there is a manifest difference concerning the proof which a given libelant undertakes to demonstrate, depending

upon which of the two theories he elects to stand.

As the result of litigation against the owner of another ship upon which the libelant sailed at a later date, the second cause pleaded in this libel for maintenance and cure was withdrawn. (See Minutes 10/31/56, p. 21:

" * * * There was a full accord and satisfaction. We are making no claim in this case for any maintenance * * * I am making no claim here for maintenance.")

A continuance was had on that occasion, and final hearing was not possible because of intervening engagements of counsel, and inability of the court so to manipulate its calendar, until March 12, 1958.

The relevant facts may be thus summarized:

The libelant was born July 23, 1928, and therefore was eighteen years of age when he signed on as an oiler on the Rockland in January of 1946, at the port of New York for the voyage to begin at Houston, Texas, for the carriage of a cargo of horses. Prior to signing on, he underwent a physical examination (Dr. Dugdale) and he said that although no x-rays were taken at that time, there had been on prior occasions, of his chest, heart and lungs, with no abnormalities disclosed. His height was about six feet, and he weighed 170 pounds.

During the year or so prior to this voyage, he had worked on harbor vessels, dredges, etc. and was aware of no difficulty in performing the incidental tasks of his occupation; he had suffered from ordinary colds which he said lasted for two weeks or so, from which he had no difficulty in making recovery.

His base pay as an oiler on the Rockland was $177.50 per month, which was increased to average about $250 a month by reason of overtime; his duties were those to be expected, such as lifting a twenty pound plate from a tank, helping to clean out oil tanks, taking clearance on the main bearings which involved removing the cylinder heads, etc.; he worked five 8-hour days per week, and his sleeping and appetite were normal.

The Rockland proceeded to the port of departure stopping at Key West to refuel; the cargo of horses was laden at Houston, and his testimony is that several of them suffered from respiratory conditions to such an extent that some died of pneumonia before they left port.

The total number of animals laden seems to have been about 792.

In parentheses it should be noted that incidents of the voyage as herein stated are based upon the testimony of the libelant and the one shipmate whom he called, (Fitzsimmons). No testimony was offered by the respondent in contradiction of what they said.

The libelant observed as the vessel was being made ready in New York, that stalls on the main deck were erected, and that several, if not all, of these stalls were occupied by horses on the outbound voyage. The log of the vessel which is in evidence, contains entries showing that the horses were loaded into the holds of the ship, but nothing therein is stated concerning their presence in the stalls on deck.

Selby complains that while he was walking on deck during the voyage he passed close to the stalls and that the horses coughed, sneezed and otherwise communicated flying sputum which he was forced to breathe and which also fell upon his clothing. The photographs which he presented, constituting Libelant's Exhibit 10, would be consistent with partial occupancy of the stalls by horses, but it is impossible to determine from the record whether that occupancy was a permanent or transitory thing; nor is it certain that they have to do with the first voyage of the ship.

No finding can be made on this subject because the evidence as a whole leaves the court in doubt on the subject.

Selby also asserts that the stalls were not cleaned by the handlers and that the accumulation of excreta on deck and in the holds, rendered the atmosphere of the entire ship nauseating in the ex-

treme, particularly when the ship was navigated on sunny days.

The libelant's theory is shortly that by reason of the said conditions which he related in considerable detail, he lost his appetite and was thus unable to nourish his body, whereby his resistance was so lowered that the tubercle bacilli were enabled to gain ascendency with the result hereinafter to be stated.

The ship's destination was Trieste, where the cargo was discharged, (except for the dead horses which had been disposed of) departure from Houston having been had on or about February 22, 1946; return to the latter port was accomplished on April 3rd, and the crew was paid off on April 5th.

Selby signed on for a second voyage on April 22nd. The fact that he did so in spite of the conditions which he says obtained on the first voyage, is not without significance both as to his health on the latter date, and the actual conditions on shipboard during the first voyage.

As to the second, it began on April 25th, the destination being Volos, Greece, where arrival was had on May 12th, and the return to Norfolk was accomplished by June 8th. This time the log shows that 814 mules and mares were laden, of which only ten died.

The interval between the two sailings was spent by Selby on the ship which remained at Houston. He testified that before Articles were signed for the second voyage, there was an informal meeting in the mess hall by the members of the crew, and that an oiler was delegated to speak to the captain and to request that the stalls be cleaned out every day on the forthcoming voyage; he was unable to give the name of that oiler other than Frank, with whom he had already made one trip; he said that the latter reported back to the group prior to the signing of the Articles; that following what he said, the men did so sign.

The testimony is so vague and indefinite that it is not to be relied upon, but mention is made of it because it appears in the record.

As to the start of the second trip, libelant's testimony is:

"As I said, I felt well, and perhaps a week, seven or eight days out of Houston, I started to get extremely fatigued again, much worse than the first time, and the stalls were not cleaned out, and there was a lot of discussions about it again, but nothing could be done.

\* \* \* \* \* \*

"As I say, the stench increased, I was getting extremely fatigued and got very sick one night, a violent upset stomach, and I had to be relieved of my watch. I had found it difficult to eat anything, even toast or anything on this trip."

As to the return voyage, he testified:

"I was still fatigued, and during the trip I did go to the purser several times for the cough. I was given aspirin \* \* \* and then, oh, two weeks or so before the end of the voyage I developed trouble with my mouth. \* \* \* and we paid off in Norfolk, I was very very ill."

On June 10, 1946, he returned to his home and consulted two physicians for the mouth condition. During the ensuing six weeks he was treated with penicillin, and apparently the gums were lanced; at the end of that period he felt better and shipped on the Kyska; before doing that he was examined by a Dr. Small for the Waterman Steamship Company, but no x-rays were taken.

Three days after being at sea (about August 17, 1946) Selby started hemorrhaging and spitting blood. Arrival was had at Bremen on Labor Day and he went to the Army Dispensary and was ultimately transferred to the 121st General Army Hospital at Bremerhaven; at the end of two weeks he was put aboard a hospital ship and returned to New York on November 5th, and was taken to the Marine Hospital on Staten Island; within a few hours he was transferred to Neponsit Hospital, Tubercular Wing.

The hospital history indicates that Selby said that an x-ray was taken in

the Army Hospital in Germany when he was told that he had tuberculosis and was "placed on bed rest." It thus appears that the diagnosis made in Germany fixes the existence of the disease in recognizable form at that time, and it becomes necessary to ascertain if possible the probable date when the tubercular condition may be thought to have come into existence.

The libelant's medical witnesses were: Dr. J. George Lang, Dr. William Weingarten, and Dr. Judah Zizmore.

The first named made his own diagnosis in the month of April, 1947, which was "pulmonary tuberculosis, far advanced, caseous pneumonic tuberculosis with cavitation of left lung."

Dr. Lang expressed the opinion that the condition of the patient on November 7, 1946 indicated a duration of the disease of from six to nine months.

Dr. Weingarten testified as an expert; he seems not to have examined the libelant at any time; he gained his information entirely by consulting the hospital records, which disclose the progress of Selby's illness from the time that he was first admitted to the Neponsit Hospital.

He expressed his opinion to be that the conditions on shipboard which have been outlined above were a competent producing cause of the tuberculosis from which the libelant suffered. In so doing, he assumed good health on the part of the patient at the outset of the first voyage. He stated clearly that the presence on the ship of dead horses was not such a cause. Libelant's counsel put the matter clearly, thus:

"Right through the case, we never claimed that he was infected by the horses or had gotten any disease that the horses had."

Dr. Zizmore was examined specifically in connection with Libelant's Exhibit 3, which included an x-ray of the libelant's lungs taken on April 24, 1945, over nine months before the start of the first voyage of the Rockland. That was taken under the doctor's supervision and he interpreted it at the time and again for the purpose of testifying in this cause.

He says that it discloses no sign of tuberculosis, namely, that there is no evidence of infiltration. Dr. Edlin, called for the respondent, is of the contrary opinion as to how that x-ray should be interpreted.

The libelant shipped on the Kyska during the month of August, 1946, and following the developments of that voyage which have been stated, certain litigation ensued which should be briefly explained:

This libelant, who was then an infant, by his mother as guardian ad litem, brought a civil action in the Southern District against the Waterman Steamship Corporation and the Waterman Steamship Agency, Ltd. (File No. 44-752) on February 11, 1948. The father was also a plaintiff in his own right. The first cause was under the Jones Act, the second was for maintenance and cure, and the third by the father to recover for medical expenses.

The cause as to the Waterman Company as general agent necessarily failed for familiar reasons, so far as the Rockland is concerned. It was proper as to the Kyska, because the Waterman Company actually owned, operated and maintained that ship.

After the lapse of four years and in April of 1952, the plaintiff brought a motion for leave to file an amended complaint, seemingly with reference to both vessels, and at the same time to have that amended complaint dismissed as to the Rockland. The motion was contested as counsel stated in this trial, for the reason:

" * * * that obviously the amended complaint was bad on its face and that this so-called cause of action which was being set up wasn't a cause of action at all, and that therefore to set it up and throw it out would have an impact on or might have an impact upon the action pending here which your Honor is hearing.

"I might add that in the meantime, and before this motion of 1952, and while the matter was at law in the Southern District, a libel was filed in this case, that is in 1951." (The filing date was June 22, 1951.)

That motion resulted in an order by Judge Weinfeld dated May 17, 1952, the material portions of which have been read into this record, namely,

"It states:

" 'That the original complaint herein be deemed to assert two separate claims, one relating to and arising out of the period of service of the plaintiff, Hubert N. Selby, Jr., aboard the SS Rockland Victory, and the second relating to and arising out of his period of service aboard the SS Kyska;

" 'And it is further ordered that the first claim arising out of the period of service aboard the SS Rockland Victory, be hereby and is dismissed against the defendant Waterman Steamship Corporation solely by reason of the decision of the Supreme Court of the United States in the case of Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692;

(Note: The date of that decision was June 27, 1949.)

" 'And it is further ordered that the second claim arising out of the period of service aboard the SS Kyska is continued.' "

Further:

" 'The second claim is set forth in the proposed amended complaint attached to the moving papers'—well, it is deemed the complaint on that cause of action."

Further:

" 'Ordered that this disposition is without prejudice to the rights of the respondent, United States of America, in the libel bearing Admiralty No. 19,700, now pending in the United States District Court for the Eastern District of New York.' "

Thereafter the Southern District action involving the Kyska was discontinued pursuant to a stipulation, after an amended complaint had been filed which omitted the third cause as originally pleaded on behalf of the father for medical expenses.

The order of discontinuance was filed on March 23, 1956 and the stipulation upon which it was based provided for the payment of $4,913.50 which was the full amount of the maintenance claim and "in full satisfaction of all claims in the pending action."

It now becomes necessary to decide whether the libelant has sustained his burden of proof to the effect that the Rockland was unseaworthy and that it was so negligently operated that he was thereby caused to become a victim of tuberculosis and disabled from following other than a sedentary occupation.

It will be seen that the issue turns upon whether the proof demonstrates that the ship was so maintained and operated on the first voyage that the libelant was caused to become a victim of tuberculosis.

He signed Articles as an oiler on a ship which he knew would carry a considerable cargo of horses across the Atlantic Ocean. Therefore he must be held to have contemplated the usual and ordinary incidents and conditions of his duties as oiler upon a ship so to be engaged.

It is also true that he had a right to expect that the operation of the ship would be so conducted that no reasonable precautions would be omitted to safeguard the health of the human beings in the crew. This would seem to mean that the ship would be maintained in as cleanly and sanitary a condition as was reasonably possible; that obligation might be likened to the duty to provide adequate and nourishing food; safe and dry sleeping quarters; a cleanly mess hall where the members of the crew could partake of their meals in an atmosphere reasonably free from avoidable contami-

694

nation peculiar to the nature of the ship's business.

The one respect in which the testimony of the libelant points to a failure so to maintain the ship is that the officers did not require the handlers of the animals to daily clean out the spaces occupied by the latter.

It is uncontradicted that the handlers were members of the ship's crew, therefore under the direction of the ship's officers, and Selby's testimony is that the handlers refused to perform certain of their duties, unless they were paid overtime for so doing, and rather than meet that request the officers took no affirmative corrective action.

Specifically the foregoing refers to the refusal of the handlers to discharge dead horses promptly.

On this subject he says:

"It seems that the deck crew was under the impression that the horse handlers were to discharge the animals, this was on week-ends, and they said, no, that they weren't, that wasn't their job, and the chief mate refused to pay overtime for it, so that was allowed to accumulate until the working day of Monday morning."

The foregoing is contradicted by the entries in the rough deck log, in evidence, as to the discharge of dead horses on Sunday, February 24th, Saturday and Sunday March 2nd and 3rd, and Saturday and Sunday March 9th and 10th, 1946.

Those entries have not been discredited, and must be accepted. They were not made in contemplation or aid of litigation, and their necessary impact upon the libelant's testimony concerning the general conditions prevailing upon the ship during this voyage is not to be minimized. If he has been shown to be wrong as to the discharge of dead animals, what he says about the unarrested accumulation of excreta is rendered suspect.

While litigation was instituted in 1948 about two years after Selby's first voyage on the Rockland, nothing seems to have been done by either party at that time, by way of taking testimony of any of the ship's personnel concerning the actual conditions which prevailed during February and March of 1946.

The absence of such depositions has left this court with but fragmentary and unsatisfactory data upon which to base a decision. Even though the Rockland was ultimately excluded from the Southern District cause and was not brought into this case until 1951, it would seem that adequate preparation for the earlier case would have suggested to either party, that which would have avoided the flagrant omission now the subject of comment.

The fact that Selby signed on for the second voyage suggests that the conditions on the first were not as bad as he painted them. Fitzsimmons does not recall conditions in any such detail as the libelant has described them. The former summarized them thus:

"Naturally, the smells and a lot of manure, the horses they became sick, they were constantly being brought out of the holds and thrown over the side."

As to his observations of Selby, Fitzsimmons did not notice him coughing or spitting blood; as to the second voyage he remembered that Selby was laid off a couple of days and one of the juniors took his place on watch. Concerning the end of the second voyage, Fitzsimmons said:

"The only thing I can truthfully recollect is the flight home (an aeroplane trip from Norfolk to New York City). That is where he just wasn't up to snuff. I remember we had to wait for the plane, we were in a hotel in Norfolk and he wasn't feeling too good."

Further it is to be remembered that so far as this record discloses, no other member of the ship's company was adversely affected by the conditions aboard ship on either the first or second voyage, and if things were as bad as Selby said they were, it would be reasonable to ex-

pect that other members of the crew would have been adversely affected, even perhaps as he was.

The court is thus called upon to deal with the case of a young man who during 1945 and immediately prior thereto, was earning his living in a maritime calling, without being aware of any respiratory disability or other infirmity. He signed on the Rockland for two voyages, as stated; during the first he developed a cough, suffered loss of appetite and noticed that his clothes began to hang loosely. On the return voyage he felt better, thus:

"By that time I felt rather well, I felt much better than I did going over."

As to the clearing up of his cough:

"Yes, yes. I wouldn't say completely, but as far as I can recall, it was no cough, no significant cough"

" * * * and by the time we sailed on the second trip I felt very well again, but * * * "

(Continuing) " * * * perhaps a week, seven or eight days out of Houston, I started to get extremely fatigued again, much worse than the first time. * * * "

As has been said, the libelant attributed the general physical debility from which he suffered, to the generally lax conditions which prevailed on the ship considering the nature of its cargo, and the lack of effort to minimize the inevitable incidents attendant upon such a venture.

The subsequent recognition of Selby's tubercular condition has been stated. The outcome was of serious consequence, for the disease required the removal of part of a lung, other surgical procedures, and prolonged hospitalization. His partial disability is permanent, and his health has been so impaired that he is restricted to a sedentary calling, with intermittent periods of rest. He is married, is the father of two children, and within obvious limits his life can be thought of as normal, and he is able to pursue a gainful occupation. His cause appeals to the sympathy of any one apprised of his physical condition, but it does not follow that the ship can justly be held to blame for it.

So much of his cause as alleges unseaworthiness on the part of the Rockland is not sustained by the evidence, namely, her reasonable fitness for the voyage or work of the transportation of a cargo of quadrupeds, as to her state of repair, her equipment, and her crew; her ability to meet the ordinary peril of the two voyages here involved, and to carry safely the cargo and the crew which she undertook to transport.

The foregoing is thought to be in accord with the cases which define the meaning of the warranty of seaworthiness (Cf. Boudoin v. Lykes, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354).

The finding is that libelant has failed to prove unseaworthiness on the part of the Rockland Victory.

Coming now to the question of negligence, which is probably so closely related to that of unseaworthiness as to be not easily distinguishable therefrom, it is to be borne in mind that the libelant was entirely aware that he was signing on a ship about to be engaged in the transport overseas of a considerable number of horses. This means that in order to maintain his cause, he must demonstrate by the greater weight of evidence that it was not the nature of the ship's calling but the manner in which it was conducted that caused him to become tubercular.

There is no testimony to the effect that mortality among the animals being transported, which was considerable on the first voyage, was traceable to any conditions created or tolerated on the ship; there is no testimony that some degree of mortality is not an expectable incident of the transportation of animals in the holds or even on deck. In other words, the inquiry is necessarily focused upon the subject of the degree, not to the kind, of alleged fault shown in the conduct of those engaged in the transportation of this cargo.

The libelant has not stated that he was called upon in the performance of his regular duties, to render extra and unusual services or to put forth heroic exertions to help keep afloat a ship that was suffering from multiple unseaworthiness, as in Boboricken v. U. S., D.C., 76 F.Supp. 70.

He has offered no testimony that his sleeping quarters were deficient in any respect, as in Hern v. Moran, supra, McGhee v. U. S., 2 Cir., 165 F.2d 287, Murphy v. Overlakes Freight Corp., 2 Cir., 177 F.2d 342, Pineiro v. U. S., D.C., 65 F.Supp. 191, and Hoff v. U. S., D.C., 87 F.Supp. 909.

Since Selby relies upon the creation of a new physical condition rather than the aggravation of an existing one, the burden of proof resting upon him is the demonstration of a definite affirmative.

The opinions of his experts were necessarily circumscribed because their conclusions concerning him were not based upon any familiarity with his physical condition at any time; it was at most an expression of a belief based upon the assumption of his accurate statement of conditions on the ship, that his tuberculosis *could* have arisen on the first voyage. This means that the court is required to decide whether the conditions actually existing on the first voyage of the Rockland were so much worse than they ought to have been—all things considered—that the surmise of the experts must be accepted.

In view of the extent to which Selby's testimony concerning the discharge of dead horses has been contradicted by the log entries, and the limited support to be found in the testimony of Fitzsimmons, quoted above, as to the general conditions on the ship, I am constrained to find and so decide that the libelant has not sustained the rather ambitious burden of proof which he undertook. He has not demonstrated by the weight of credible evidence, that the Rockland was not operated and maintained as a transport vessel carrying 700 or more horses, so that a member of her crew was not provided with a reasonably safe place to work, whereby he was caused to become a victim of tuberculosis.

For this reason the libel must be dismissed, but without costs.

■ The respondent has urged that the court is without jurisdiction for failure on the part of the libelant to serve the notice of claim required by the Clarification Act, 50 U.S.C.A.Appendix, § 1291 et seq.

Under date of April 30, 1958 a communication was addressed to the court enclosing what is believed to be a copy of a notice addressed to the War Shipping Administration, care of Waterman Steamship Corporation, under date of April 3, 1951, which seems to be adequate as a notice.

There is no contradiction of the filing of such notice so far as this court is now advised, and accordingly the jurisdictional point is resolved in favor of the libelant, subject however to the right of the respondent to re-open the case on that issue if it be so advised, for the purpose of demonstrating that no such notice was given.

Settle decree.