**GEORGE H. McFADDEN & BROS., and other cargo owners named herein, Libellants,**

v.

**THE M/S SUNOAK, her engines, boilers, etc., and Skibs A/S Hassel, her owner, and THE S.S. LESLIE LYKES, her engines, boilers, etc., and Lykes Bros. Steamship Co., Inc., her owners, Respondents.**

No. 7880.

United States District Court
E. D. Virginia,
Norfolk Division.

Oct. 29, 1958.

Wicker, Baker & Goddin (E. Ballard Baker), Richmond, Va., for libellants.

Vandeventer, Black & Meredith (Braden Vandeventer, Jr.), Norfolk, Va., for M/S Sunoak and Skibs A/S Hassel.

Seawell, Johnston, McCoy & Winston (Harry E. McCoy), Norfolk, Va., for SS Leslie Lykes and Lykes Bros. S.S. Co.

**WALTER E. HOFFMAN,** District Judge.

This is an action for cargo damage sustained at New Orleans, Louisiana, and Bremerhaven, Germany. The first cause of action is solely against the respondent, Lykes Bros. Steamship Co., Inc. Following a fire at New Orleans, the cargo was reloaded aboard the S.S. Leslie Lykes and thereafter came into collision with the M/S Sunoak owned by a citizen of Norway. The second cause of action is against all respondents seeking a recovery for cargo damage.

A general appearance has been entered by Skibs A/S Hassel, the Norwegian owner of the M/S Sunoak, and we are not further concerned with this respondent at this stage of the proceedings.

The libel was filed on October 29, 1957, and such service as was had upon Lykes Bros. Steamship Co., Inc., was on L. E. Pentecost designated in the return of the Marshal "as manager of United States Lines as agent and port representative". It is contended that Lykes was doing business in Virginia on the date of the service on November 1, 1957, for the reason that the S.S. William Patterson, a vessel owned by the United States of America and assigned to Lykes under a General Agency Agreement, was in the Port of Hampton Roads at that time, and was being husbanded by United States Lines as a sub-agent, designated as such by Lykes under the authority of the General Agency Agreement.

Lykes filed a special appearance and motion to quash the service upon Pentecost, who admittedly is the general manager for the South Atlantic District of the United States Lines. Lykes insists that it is not "doing business" in Virginia, and was not at the time of service.

Lykes owns and operates approximately 54 vessels on its own account sailing to and from the Gulf area. During 1957 it made 329 foreign sailings with its own fleet and, for the first seven months of 1958, the sailings were comparable to 1957. Its gross revenue in 1957 was approximately $89,000,000. It maintains no office, has no employees, maintains no property, bank account or other assets, within the State of Virginia. It has not solicited, transacted or obtained any freight or passenger business in Virginia, either directly or through any agent. It has designated no agent upon whom service of process may be had in Virginia.

For a period of five years prior to service upon the authorized representative of United States Lines, only two vessels owned and operated by Lykes had occasion to visit any Virginia port. On November 15, 1956, Lykes acquired the S. S. Enid Victory under a bareboat charter from the United States and took possession of the vessel at Norfolk. The vessel did not load or unload any cargo and, after a survey by Lykes, she was taken to the Gulf in ballast. The only services performed by the United States Lines were on a fee basis as agent for husbanding the vessel. Several months thereafter, on January 11, 1957, the S.S. Joseph Lykes, owned and operated by respondent, put into Norfolk for emergency repairs and, while at Norfolk, the United States Lines again performed the customary husbanding service during the two-day stay of the vessel. She did not load or discharge any cargo while at Norfolk.

|  |  |
|---|---|
| S/S Salpulpa Victory | 8/ 7/53 to 9/ 2/53 |
| S/S Mateo Victory | 5/23/56 to 5/24/56 |
| S/S Mateo Victory | 6/ 9/56 to 6/13/56 |
| S/S William Patterson | 11/ 1/57 to 11/ 2/57 |

■ Manifestly the foregoing activities do not constitute "doing business" in Virginia under the principles established in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95. See also: Rosenberg Bros. & Company v. Curtis Brown Co., 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372. We turn, therefore, to the activities of Lykes as General Agent for the United States (Maritime Commission) under the familiar General Agency Agreement.

In this latter capacity, Lykes has designated, subject to cancellation by the Government, the United States Lines to serve as sub-agent for handling vessels in the Port of Hampton Roads. During the five-year period prior to service, the following vessels owned by the United States visited Virginia ports, all being assigned to and managed by Lykes under the General Agency Agreement:

---

As between Lykes and United States Lines, the services performed by the latter have always been on a ship-to-ship basis, with no continuity of service. This is true as to Lykes-owned vessels as well as vessels owned by the United States. A fixed fee based upon the number of days in port, plus advances for husbanding services, constitute the operations by United States Lines.

Under the General Agency Agreement the Government retains full control over the navigation management and physical operation of each vessel. Lykes does not ship any commercial cargo in the vessel, and receives no freight for any commercial cargo which the Government ships in its vessels. The Government issues directives as to ports of call, routing of the vessel, and cargo to be transported. Lykes is compensated on a per diem basis. The sub-agent, United States Lines, performs substantially the same husbanding services as with vessels owned and operated by Lykes. It arranges for watchmen, stores, fuel, and water. It handles papers with custom authorities, crew matters, advances to the Master and, where necessary, coordinates as to the repairs of the vessel.

■ Unless the visits by vessels under the General Agency Agreement may be deemed "doing business" in Virginia by the General Agent (Lykes), it is unnecessary to consider the extent or quantity of the activity.

The qualitative nature of the activity does not justify a finding that Lykes was "doing business" in Virginia. The sub-agent (United States Lines), although designated by Lykes, was in fact the agent of the owner (United States), in

the absence of any showing that the activity extended beyond normal husbanding services. Libellant relies upon Van Horn v. Waterman Steamship Corporation, D.C.Pa., 71 F.Supp. 347. There the vessels were under time charter, having been taken over by the Government from Waterman. The time charterer, Pan Atlantic Steamship Company, was a subsidiary of Waterman, and had the right to say where and when the vessels would go; an arrangement to which Waterman had consented in advance. The extent of the holding in Van Horn, as well as in Neset v. Christensen, D.C.E.D.N.Y., 92 F.Supp. 78, is to hold the owner in court where service is made upon the master or manager of the owner.

■ It is, of course, true that service upon a mere husbanding agent is sufficient to bind the owner of the vessel while the ship is in port, and perhaps until the husbanding agent has paid the bills incurred and submitted its account to the General Agent for the account of the owner. This is not to say, however, that service upon a husbanding agent is tantamount to service upon the General Agent. Understandably, the activities of the General Agent may bring the General Agent within Virginia to the end that it is "present" under the doctrine pronounced in International Shoe Co. v. State of Washington, supra. The appearance of a Port Captain or Representative, the change of an entire crew, the presence of a vessl for a long and continuous period of time, all suggest that a General Agent could be "doing business" in Virginia, but the evidence in this case points to the fact that ordinary husbanding services were carried out in each instance with no solicitation of freight or passengers.

The present case is substantially similar to Spreckels Sugar Co. v. South Atlantic S. S. Line, D.C.S.D.Ga., 55 F.Supp. 670, 672, wherein service was made upon a husbanding agent in an effort to reach Isthmian Steamship Company, a General Agent for War Shipping Administration. The court said:

> "The obstacle to be overborne here, however, is that Isthmian had no agent of its own in this district upon whom service could be made. The sub-agent appointed by Isthmian was not the kind of agent that would justify bringing Isthmian into court by service upon him."

In entering into the General Agency Agreement both Lykes and the United States contemplated that the vessels would visit ports where Lykes had no office or personnel to attend to the husbanding of the vessel. For this reason authority was granted to Lykes to designate sub-agents, but the Maritime Commission reserved the right of termination of any sub-agency agreement at any time. While it may be true that the sub-agent in the present case was carrying out a duty assigned to Lykes, the General Agent, under the General Agency Agreement, it was in the nature of an independent contractor that the "sub-agent" performed any service to Lykes, although conceivably the sub-agent was the agent in fact of the United States for husbanding the vessel. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692; Weade v. Dichmann, Wright & Pugh, 337 U.S. 801, 69 S.Ct. 1326, 93 L.Ed. 1704; Caldarola v. Eckert, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968.

Holding that, under the circumstances of this case, Lykes was not "doing business" in Virginia at the time of the service of process upon the manager of the sub-agent, United States Lines, the motion to quash must be sustained. Present order.