434

Petition of the **UNITED STATES** of America and Marine Transport Lines, Inc., as owners of the **U.S.N.S. POTO-MAC,** for exoneration from or limitation of liability.

No. 273.

United States District Court
E. D. North Carolina,
New Bern Division.

April 8, 1964.

William E. Gwatkin, III, Dept. of Justice, Washington, D. C., for the United States.

Hugh S. Meredith, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for Aviation Fuel Terminals, Inc.

Donald E. Klein, Schwartz & O'Connell, New York City, for claimants Smith and Salopek.

Sidney H. Kelsey, Norfolk, Va., for Leonard, Adm'x.

C. Arthur Rutter, Jr., Norfolk, Va., for Alves and others.

Claud Wheatley, Jr., Beaufort, N. C., George H. McNeill, Morehead City, N. C., William K. Rhodes, Jr., Wilmington, N. C., Joseph H. Levinson, Smithfield, N. C., for claimants.

WALTER E. HOFFMAN, District Judge.

On September 26, 1961, the USNS POTOMAC, titled in the name of the United States of America, was discharging fuel oil at the Aviation Fuel Terminals in Morehead City, North Carolina. A fire broke out and, followed by several explosions, the vessel was a constructive total loss. After the institution of several actions in the Eastern District of Virginia by allegedly injured seamen employed aboard the vessel, the matters

were transferred to the Eastern District of North Carolina where, in due time, the instant limitation proceeding was commenced by the United States of America and Marine Transport Lines, Inc., as the remains of the POTOMAC were in this latter jurisdiction.

In the limitation petition filed herein, it is stated in part:

"SECOND: That petitioner Marine Transport Lines, Inc., was at all times material hereto and now is a corporation duly organized and existing pursuant to the laws of the State of Delaware, and owner pro hac vice and operator of the United States Naval Ship POTOMAC, which at all material times operated said vessel as a public vessel of the United States for and on behalf of the United States Navy as operating agent and owner pro hac vice pursuant to contract whereby the said Marine Transport Lines, Inc., manned, victualled, supplied, operated and navigated the said USNS POTOMAC at its own expense and by its own procurement, and was owner and charterer of the USNS POTOMAC within the meaning of 46 U. S.C. § 183–189."

In response to the monition issued on said petition approximately 38 claims aggregating $2,100,000.00 were filed. Many of these claims were dismissed, either in whole or in part, at the time of the eleven-day trial conducted at New Bern, North Carolina, commencing March 11, 1963. The official reporter who recorded the proceedings is no longer employed by the federal government and, while proctors and the court are hopefully awaiting the transcript, prospects for delivery of same are not in the immediate future.

The POTOMAC has no value for limitation purposes as it is obvious that the costs of salvage will far exceed her scrap value. Assuming that the provisions of 46 U.S.C. § 183(b) are applicable, the available fund for death and personal injury claimants will be slightly in excess of $900,000.00, computed on 15,626 gross tons. On paper at least, the case presents a mutiple claim inadequate fund limitation proceeding although, with several exceptions, many of the claims may be considered excessive.

Two seamen, Smith and Holley, filed admiralty actions in the United States District Court for the Eastern District of Virginia shortly after the fire. As noted, these cases were transferred to the Eastern District of North Carolina. Smith became ill and subsequently died on December 2, 1961, apparently prior to the transfer. His administratrix qualified in a Florida court and has heretofore instituted an action in this court against Aviation Fuel Terminals, which proceeding has been held in abeyance as Aviation Fuel Terminals was an active party in the limitation trial. At the final pretrial conference held approximately 40 days prior to trial, proctors for Smith's administratrix notified the court and all proctors that a request would be made to modify the injunctive order of March 26, 1962,which stayed and restrained the institution and prosecution of any legal proceedings, except in the proceeding for exoneration from or limitation of liability. A formal motion requesting such modification to permit Smith's claim to be instituted against Marine Transport Lines, Inc., under the Jones Act in another forum was filed at the time of trial. The claimant Holley, while not having advised the court prior to trial, likewise indicated a desire to bring a Jones Act suit against Marine Transport Lines, Inc., in another forum and has now filed a similar motion.

While there may be some doubt as to the propriety of instituting actions against Marine Transport Lines, Inc., in the forums suggested by proctors,[1] it is abundantly clear that, but for the limitation proceeding and the question raised by the government that the POTOMAC is a public vessel and any action must be brought under the Public

---

1. Leith v. Oil Transport Company, 3 Cir., 321 F.2d 591, discussing the venue provisions of the Jones Act.

Vessel's Act, these claimants could maintain actions under the Jones Act against their employer, Marine Transport Lines, Inc. With the three year statute of limitations rapidly running, should the court now grant a modification of the order to at least permit these two claimants to file Jones Act proceedings in an appropriate forum? We think this question should be answered in the negative under the particular facts of this case, subject to a modification under specific conditions to permit the claimants to institute Jones Act proceedings pending an appeal from an interlocutory order to be entered in accordance with this memorandum.

It is fundamental that, if a Jones Act proceeding is to be instituted, it must be commenced within the statutory period of three years from the date of injury or, in the event of death, within three years from the date of death. The filing of a limitation proceeding does not toll the statute. It is for this reason that the court is willing to modify the injunctive order to permit the claimants to file appropriate actions in other forums, conditioned that the claimants will dismiss such actions without prejudice in the event an appeal from the present ruling is affirmed, in which event the claimants may then proceed in this limitation proceeding. Of course, if the decision of this court is reversed on appeal from the interlocutory order, such action will have the effect of further modifying the injunctive order and thereby permit the claimants to proceed against Marine Transport Lines, Inc., in the selected forum.

There is reputable authority justifying the modification of injunctive orders to permit the filing of actions at law under the Jones Act in matters not involving public vessels. In re Wood's Petition, 2 Cir., 230 F.2d 197; Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 279 F.2d 546. Cf. Moore-McCormack Lines, Inc. v. Richardson, 2 Cir., 295 F.2d 583, 96 A.L. R.2d 1085. We do not reach consideration of the discretionary power of the court in such instances. Nor is it appropriate to discuss the authorities relied upon by the government in urging that admiralty should determine all of the claims. Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612; British Transport Commission v. United States, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234.

The controlling question is, we think, one of interpretation of the contract between the United States of America and Marine Transport Lines, Inc., dated June 22, 1961. Do the methods of operation provided therein come within the familiar rule of Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692? In that case the court said (337 U.S. 795, 69 S.Ct. 1323):

"The solution of the problem of determining the employer under such a contract depends upon determining whose enterprise the operation of the vessel was. Such words as employer, agent, independent contractor are not decisive. No single phrase can be said to determine the employer. One must look at the venture as a whole. Whose orders controlled the master and the crew? Whose money paid their wages? Who hired the crew? Whose initiative and judgment chose the route and the ports? It is in the light of these basic considerations that one must read the contract. No evidence has come to our attention that indicates the general agent ever undertook to give orders or directions as to the route or management of the ship while on voyage."

The remedy available to any person injured or killed aboard a public vessel is under the Public Vessels Act, 46 U.S.C. §§ 781–790, incorporating by reference the Suits in Admiralty Act, 46 U.S.C. §§ 741–752. The 1950 amendment of 46 U.S.C. § 745 now provides—

"That where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the

United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim."

While the identical contract now presented was not before the court in Williams v. United States, 133 F.Supp. 317, aff'd. 4 Cir., 228 F.2d 129, cert. den. 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499, there are similarities in line with Cosmopolitan Shipping Co. v. McAllister, supra, which manifestly demonstrate that the enterprise was that of the United States of America. Assuming arguendo that the cause of the fire and explosion was due to negligence of the master or crew of the USNS POTOMAC, or the unseaworthiness of said vessel, there is nothing that Marine Transport Lines did, or failed to do, for which the United States is not subject to direct liability under the Public Vessels Act.

Analyzing the contract in question, we find:

(1) Marine Transport agreed to manage and conduct the business regarding the operation of certain tankers, including the USNS POTOMAC, in accordance with written directions or orders as to voyages and cargoes as the government prescribed.

(2) Marine Transport authorized the master of each tanker to carry out all orders, directions or instructions regarding the employment of the vessel and prosecution of voyages as issued by the Commander MSTS.

(3) All tankers are declared to be owned by the government as public vessels, and are employed solely in the public use or in the protection of the national interest or economy.

(4) Marine Transport, at the cost and expense of the government, was obligated to equip, fuel, supply, maintain, man, victual and navigate the tanker. Any master or chief engineer so procured by Marine Transport, and the compensation paid to such officers, was subject to the approval of the government. Any master, deck or engineer officer was required to become a member of the United States Naval Reserve to serve aboard a tanker.

(5) Marine Transport agreed to procure other licensed and unlicensed personnel through usual channels in accordance with customary practices in commercial operations.[2] All licensed officers and no less than ninety percent of the crew employed on the tanker were required to be United States citizens.

(6) The officers and crew were subject only to orders of the master and Marine Transport. It is specifically provided that the master, officers and crew members are employees of Marine Transport and not of the government.

(7) Labor agreements covering the operation of tankers are subject to approval by the government.

(8) Marine Transport agreed to maintain its accounting procedures subject to the approval of the Contract Audit Division of the Comptroller of the Navy.

(9) Marine Transport is paid by the government a fixed fee per day for the operation of a tanker, same covering management expense and profit.

(10) Marine Transport is paid by the government a post-redelivery fee for each tanker.

(11) Marine Transport is reimbursed by the government all allowable cost of operating and maintaining the tanker. Such items of allowable costs include (a) crew wages, (b) Social Security and unemployment taxes, (c) contributions to a pension fund, (d) sales taxes and foreign taxes, if not otherwise immune from same, (e) cost of insurance acquired at direction of the government,[3] (f) travel

---

2. The ship's Articles were destroyed in the fire. The court assumes that the crew signed aboard the vessel on standard articles on a form customarily used by Marine Transport Lines in its regular commercial activities, and that the interest of the government is not shown on the face of the articles.

3. The extent of insurance carried by Marine Transport in connection with its operation of the USNS POTOMAC is unknown. Obviously the potential liability

expense, (g) cost of communications, (h) overtime compensation paid to ship's personnel to the extent provided by ship's articles or labor agreements approved by the government.

(12) All funds paid by the government to Marine Transport (excepting the fixed fee and post-redelivery fee) were required to be deposited in a segregated bank account.

(13) Title to all property furnished by the government, or reimbursable as a cost item, vested in the government upon delivery by the vendor. Such property could be used only for the performance of the contract.

(14) Marine Transport could not be held liable for loss or damage of government property except for (a) wilful misconduct or lack of good faith, (b) such loss or damage as resulted from a risk expressly required to be insured under the contract, but only to the extent of the insurance so required and maintained.

(15) All agents and subcontractors selected by Marine Transport are subject to disapproval by the government.

(16) The government assumed the risk of loss of, or damage to, any tanker or cargo, any other vessels, cargoes, piers, shore installation, etc., owned by the government, whether caused by the negligence of Marine Transport, its agents, servants or employees, to the extent that such loss is not compensated by insurance required or approved by the government, and Marine Transport is declared to be not liable for any loss or damage in excess of the amount of insurance.

(17) As to claims of third parties, all officers and members of the crew are deemed to be third parties and not employees of the government. Provision is made for liability insurance as a cost to be reimbursed by the government. Within the extent of the insurance coverage certain procedures are set up for the defense and settlement of third party claims.[4]

(18) The customary provision relating to nondiscrimination in employment by Marine Transport is contained within the contract.

(19) The government retains the right to order Marine Transport to terminate the employment of any master or member of the crew whenever the employment or continued employment is deemed to be prejudicial to the interests or endangers the security of the United States.

(20) During the existence of the contract, all of the directors and principal officers of Marine Transport are required to be citizens of the United States, and at least 75% of its outstanding stock is required to be owned and controlled by citizens of this country.

(21) No supplies or services originating from sources within Soviet-controlled areas can be used in the performance of the contract without written approval of the government.

Manifestly the USNS POTOMAC was owned, controlled and operated by the government. True, the officers and crew members were employed by Marine Transport, but their duties were indirectly controlled by the government through an agency which operated under a cost-plus-fixed-fee contract. Marine Transport was in no sense a charterer of the POTOMAC. The vessel was engaged in carrying military fuel cargoes on national defense missions. Looking at the venture as a whole, it was a government undertaking and the government is liable, if at all, for the acts or omissions of Marine Transport.

Subject to the comments hereinabove indicated, an order may be presented consistent with this memorandum. The conditions of any modification of the injunc-

---

far exceeds the coverage. In such instances it frequently occurs that the government takes over the entire defense, thereby using the coverage afforded.

4. The court assumes that the third party coverage is far exceeded in this case.

If such is not a fact, the court will grant a hearing to ascertain this factual situation. The conclusion herein reached is not necessarily applicable to third party claims within the limits of coverage afforded.

tive decree, if accepted by the claimants, will be limited solely to the extent of permitting actions to be instituted in other forums to protect the running of the statute of limitations. An appeal from the interlocutory order will be certified to the United States Court of Appeals for the Fourth Circuit if and when the conditions of modification are accepted by the claimants and, if not accepted, the motion to modify the injunctive order will be denied.

By reason of the inability to secure the official transcript for the purpose of perfecting an appeal from the interlocutory order to be prepared and presented by proctor for the United States, the court will supplement this memorandum by any essential findings or conclusions omitted herein, and the court has marked as petitioner's exhibits "X" and "Y" the contract documents forwarded for the purpose of considering the motions as filed by the claimants Smith and Holley.