Benjamin Brenner, J.
Plaintiff, a seaman, sustained injuries on the vessel Turandot in waters off Hong Kong. He allegedly was ordered into an area of danger between piston cylinders, where he was struck by one of the crossbars. The ship was owned by Wilh. Wilhelmsen, of Oslo, whose general agent in the United States was the defendant, Barber Steamship Lines, Inc. The parties stipulated to waive a jury and to permit me to resolve the issue of liability for negligence under the Jones Act '(U. S. Code, tit. 46, § 688) or for unseaworthiness on examinations, depositions and legal memoranda.
Recovery under that act depends upon a preliminary finding that Barber was either plaintiff’s employer, operating and controlling the vessel, or, in the alternative, that Barber failed to inform plaintiff that Wilhelmsen was the employer or that Barber was acting as agent for an undisclosed principal. Unfortunately, the evidence discloses no direct employment of plaintiff by either Barber or Wilhelmsen. The manner and circumstances in which he was hired, though following custom *169 ary procedures, require close examination to determine which of them actually was the employer.
Plaintiff is a Chilean citizen and had come off a Norwegian ship the day he applied to the Scandinavian Shipping Office for a job as an oiler. The card in the hiring hall indicated the ship Turandot and Barber Line (plaintiff recalls this, though he claims inability to read or write, English or Norwegian). He turned in the card with proof of his union affiliation, was sent to the consulate (as required by Norwegian law), was physically examined, returned to the hiring hall, where he signed for the voyage to the Far East, and was transported in a vehicle inscribed with Barber’s name to the pier, which also bore Barber’s name. He then boarded the ship bearing the Wilhelmsen insignia. It is urged that these facts, along with Barber’s activities in relation to the vessel, establish employment by Barber, absent contact and agreement between plaintiff and Barber.
Since it is undisputed that Wilhelmsen is the actual owner and plaintiff cannot establish direct employment, he further claims that employment must be inferred because defendant had control and custody of the ship, manning, operating and navigating it. In short, he contends that Barber was the owner pro hac vice (the owner for the particular voyage) in the course of which voyage plaintiff sustained his injuries. The acceptable test for determining an employer-employee relationship, based upon the extent of the agent’s control, is that laid down in Cosmopolitan Co. v. McAllister (337 U. S. 783). The court there reiterated the rule that under the Jones Act there could be only one employer who can be sued by an injured seaman and that (p. 795) “ one must look at the venture as a whole. ” (See, also, 2 Norris, Law of Seamen, § 666.) It put the following categorical questions in construing the word ‘ ‘ employment ’ ’ to protect seamen for torts committed against them: 1 ‘ Whose orders controlled the master and the crew? Whose money paid their wages? Who hired the crew? Whose initiative and judgment chose the route and the ports? ” (p. 795).
The evidence before me leaves little doubt that, in its procurement and placement of cargo and passengers, Barber did not alone issue orders to the master of the ship nor to the members of its crew and, though it is not clear who actually hired them, the defendant Barber certainly did not. The internal operations of the ship, both in port and on the high seas, were not directed or interfered with by Barber, save in the specifics of the agency. Wilhelmsen’s husbanding agent, Martinson & Co., also issued directions for the crew’s labors aboard *170 the vessel, relative to repairs, drydocking, bunkering and general maintenance, directions which were given and followed even while Barber was performing its functions. Indeed, such division of authority between Barber, as berthing agent, and Martinson, as husbanding agent, indicates that neither of them possessed management and control of the vessel (Cosmopolitan Co. v. McAllister, supra, pp. 797-798). In short, it was not Barber’s orders which wholly controlled the master and the crew.
Was it Barber’s money which paid their wages? Clearly the answer is no. Barber in the East Coast ports and its subagents in other United States ports performed many services, soliciting and servicing cargo and passengers, for which it collected a percentage of the gross receipts. (Other general agents for Wilhelmsen performed similar services abroad, particularly in the Far East.) The gross receipts were maintained in a special account which were unquestionably the funds and property of Wilhelmsen. These were expended in behalf of Wilhelmsen to pay all expenses for the soliciting and the handling of the cargo and passengers in United States ports. One of the items of those expenses, payable out of the special account, was a payment to the master for advances against wages of the crew, including the wages of this plaintiff. The conclusion is inevitable that Wilhelmsen’s money paid the wages of the crew.
This leaves the final test — whose initiative and judgment chose the route and the ports? In Cosmopolitan Co. v. McAllister (supra) it was the ship’s owner which supplied that initiative and judgment. In the case at hand, except for the reservation of authority by the owner to change general routes, it was, in great measure, the initiative and judgment of Barber which governed the routes and ports, at least while the ship was in United States waters. In this regard the cases are dissimilar. But, though Barber would decide whether there was sufficient cargo to warrant a call at a particular port, employed subagents for the handling of freight at other United States ports, arranged for towage, pilotage, Coast Guard notification, tugs, stevedores, and advised shippers and agents when and where to deliver and accept cargo, and expedited all of these services, these tasks no longer subsisted when the Turandot was in the waters off Hong Kong. For when the ship was on its out voyage, ultimately bound for Jakarta, making intervening stops at various foreign ports, Barber’s initiative and judgment, relative to its choice of routes and ports, were no longer a factor. In those waters, Wilhelmsen’s foreign general agents *171 were in command and they alone, upon similar financial arrangements, took up like services in the foreign ports into which the Turandot was heading.
The contract between Wilhelmsen and Barber, while it referred to all ships owned by Wilhelmsen and did not make specific mention of the Turandot, is significant (see Cosmopolitan Co., supra, p. 790). True, the language is not controlling and we must look to the degree of control exercised and operative under the agreement (Romero v. Garcia & Diaz, 286 F. 2d 347, 350). But Barber was not authorized to and did not exceed the specific duties and obligations set out in the agreement to be performed by it and its subagents. Moreover, paragraph “ Fifth ” denies to Barber any “ duties and responsibilities for or in connection with the physical operation, maintenance or repairs or for the seaworthiness thereof and shall be under no liability for the consequences of any unseaworthiness or any failure properly to maintain or repair said vessel.” Thus, neither by virtue of said contract nor by any view of the “ venture as a whole ” is there any indication that the defendant Barber undertook de facto control and custody of the ship, nor that it manned, operated or navigated it. It was thus not the owner pro hac vice of the vessel.
We come now to plaintiff’s contention that the defendant Barber failed to disclose to him that Wilhelmsen was his employer, it being urged that Barber represented itself as plaintiff’s employer by virtue of the circumstances of the hiring arrangement at the Scandinavian shipping office and by virtue of Barber’s conduct evincing such relationship. The difficulty is that plaintiff and Barber never even met. There was no contact at all and so no agreement between them, without which the obligation of the agent to disclose his principal is obviously not present (2 N. Y. Jur., Agency, § 311; Restatement 2d, Agency, vol. 2, § 322; 3 C. J. S., Agency, § 216). And, assuming that words may be supplanted by conduct, such as the use of the Barber name on the hiring slip, on the transporting vehicle and on the pier — these were neither understood nor relied upon by plaintiff. Without reliance on conduct or acts, absent words, recovery based on failure to disclose one’s principal cannot be had (cf. Argersinger v. Macnaughton, 114 N. Y. 535, 539 [1889]; Kelly Asphalt Block Co. v. Barber Asphalt Paving Co., 211 N. Y. 68 [1914]). Indeed, this plaintiff apparently appreciated he was to work on a Norwegian vessel for he applied for the job at a Scandinavian hiring agency, reported to the Norwegian Consulate and boarded a ship plainly display *172 ing its Norwegian owner’s name. To claim reliance on the agent’s failure to identify the employer in these circumstances is as unrealistic as it is inappropriate. This is particularly the case because the display of the Barber name, except for the hiring card, all came to plaintiff’s notice after and not before the hiring and the Barber name on the card meant nothing to plaintiff, assuming he was capable of reading it and that it actually appeared thereon.
Assuming arguendo that the undisclosed principal theory is applicable in a Jones Act case (cf. Steele v. American South African Line, 62 F. Supp. 636 [N. D. Cal., 1945]), and that, implicit in the circumstances of the hiring arrangement, there was a transaction between plaintiff and Barber, plaintiff knew, or should have known, of the existence of the owner of the vessel at the time of his hiring. Although he alleges that the American defendant Barber did not disclose the agency, before he took the job he knew (by his own testimony) that the ship was of Norwegian. ownership. -This knowledge of Norwegian ownership, vis-a-vis the American agent, is sufficient to identify the existence of the principal without naming Mm (Instituto Cubano v. S.S. Theotokos, 155 F. Supp. 945 [S. D. N. Y. 1957]; Unger v. Travel Arrangements, 25 A D 2d 40, 47 [1st Dept., 1966]).
Plaintiff finally asserts that, upon the evidence, the defendant is liable to him for its tortious conduct even though it did no more than act out its function as an agent at the time of his injury (citing Brady v. Roosevelt S.S. Co., 317 U. S. 575, 580). However, no evidence exists that Barber hired the master and crew, so that even if general maritime law principles of liability were to be applicable here, no tort directly or indirectly flowing from its agency was committed by this defendant when plaintiff was injured while aboard the ship in Hong Kong waters. Certainly the defendant was not then in full and exclusive control, a necessary ingredient to establish liability for the tort of an agent (Caldarola v. Eckert, 332 U. S. 155, 158-159 [1947]; Cullings v. Goetz, 256 N. Y. 287 [1931]; Cosmopolitan Co., supra). In any case, the defendant’s functions as a general agent were not at time of injury operative and even if they were, the functions performed under the agency had no bearing upon or relationship to the claimed tort.
Confining ourselves, then, to the Jones Act, which provides a statutory remedy to an injured seaman for the acts and omissions solely of his employer (Steele v. American South African Line, supra, p. 638), plaintiff must look for that remedy to his *173 true employer, the owner of the ship — not the owner’s general agent, which, for a percentage of the ship’s business, merely procured and serviced its cargo and passengers in this country. This defendant, like others of the owner’s agents, such as its husbanding agent, Martinson & Co., which provided the crew and repaired and maintained the ship, or like the agency of the Scandinavian Shipping Office, which provided the hiring hall to supply a needed seaman such as this plaintiff, or the foreign general agents abroad, all served Wilhelmsen — not one of these agents by itself undertook actual operation of the ship. In short, both in this country and abroad, the owner, through its master, navigated the ship, making use of agents for specialized services, and chancing a profit or a loss from gross income.
Plaintiff relies heavily upon Barber’s numerous activities in this country to demonstrate unusual use by it of the vessel. Yet, “looking at the venture as a whole, ” and regardless of the varying nature and extent of the agents’ respective services, upon the evidence before me, neither Barber nor any other agent supplanted the owner in its overall “possession and management ” of the Turandot, the criterion established in Cosmopolitan Co. (supra). Plaintiff has consequently shown no facts to justify a finding that Barber ever assumed the rights and obligations of ownership, or that these were relinquished by Wilhelmsen at the time of plaintiff’s injury. It follows, too, that the claim based on unseaworthiness must similarly fall since Barber neither maintained the vessel nor provided the allegedly unsafe place of work.
It is my view that upon the record before me, it would be a travesty of justice to find this agent accountable for an injury which it did not cause and had no power at all to avoid or guard against. Indeed, any reasonable construction of the Jones Act, or of general maritime or common-law tort princi-' pies, in the circumstances here, absent the slightest measure of control or of presence during the navigation of the ship in foreign waters, would dictate a denial of recovery against the defendant.
Having concluded that plaintiff’s remedy does not lie against this defendant, I have not reached nor do I need to resolve liability for the alleged tort causally related to plaintiff’s injuries aboard the vessel. These views constitute my findings in accord with the requirements of CPLR 4213 (subd. [b]). Accordingly, the defendant is entitled to the entry of judgment dismissing the complaint.