# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30422

JAMES JOHNSON,

Plaintiff - Appellant

v.

GLOBALSANTAFE OFFSHORE SERVICES, INCORPORATED,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

August 13, 2015

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Eastern District of Louisiana

Before DENNIS, PRADO, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

James Johnson, a superintendent aboard a drilling rig, was shot and seriously injured by a Nigerian gunman who invaded the rig. He claims that the negligence of other rig hands caused his injury, and he seeks to hold GlobalSantaFe Offshore Services, Inc. ("GSF") vicariously liable for the rig hands' negligence under the general maritime law. The district court granted GSF's motion for summary judgment, holding that no reasonable jury could find that GSF was the rig hands' employer. We AFFIRM.

## FACTS AND PROCEEDINGS

On November 8, 2010, James Johnson was working as a drilling superintendent on the HIGH ISLAND VII, a drilling rig located near the

No. 14-30422

Nigerian coast. Prior to the evening of November 8, rig hands had moved a ball valve, attached to the blow-out preventer, in front of the stairs leading from the rig to a platform, in order to work on the blow-out preventer. When a boat was seen approaching the rig, the rig hands sought to raise the stairs, but the stairs were blocked by the ball valve. Nigerian gunmen used the stairs to board the rig, and one gunman shot Johnson in the leg. Johnson's leg was severely injured and required months of hospitalization, several surgeries, and a muscle transplant.

Johnson brought claims for negligence under the Jones Act and for unseaworthiness, maintenance and cure, and negligence under the general maritime law against PPI Technology Services, L.P. ("PPI"), PSL, Ltd. ("PSL"), Transocean Ltd., and Afren, PLC. Johnson later amended his complaint to add GSF as a defendant. These companies are related to one another in complex ways. Transocean Ltd., which has over 360 direct and indirect subsidiaries, owns and operates a large fleet that provides contract drilling services worldwide. In 2007, GlobalSantaFe Corporation, which GSF identifies as its corporate parent, merged with Transocean Inc., a subsidiary of Transocean Ltd. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 246 (S.D.N.Y. 2012). After the merger, GSF became an indirect subsidiary of Transocean Ltd. Under a contract signed March 11, 2010, Sedco Forex International, Inc. ("Sedco"), in association with Transocean Support Services Nigeria Limited, agreed to provide the HIGH ISLAND VII and drilling rig services to Afren Resources Limited. The HIGH ISLAND VII was owned by GlobalSantaFe International Drilling Inc., whose relationship to GSF is unclear. In March 2010, Johnson contracted with PSL to work for "Afren" on PSL's behalf.

The district court dismissed Afren, PLC following Johnson's motion for voluntary dismissal. The district court also dismissed Johnson's claims against

2

No. 14-30422

Transocean Ltd. because Johnson did not offer any information or argument opposing Transocean Ltd.'s motion to dismiss for lack of personal jurisdiction. The district court further dismissed Johnson's claims against PSL, finding that the court lacked personal jurisdiction over PSL. The district court ultimately granted PPI's motion for summary judgment, and that decision recently was affirmed on appeal. *Johnson v. PPI Tech. Servs., L.P.*, 605 F. App'x 366, 367 (5th Cir. 2015). The district court granted GSF's motion for summary judgment on Johnson's claims for negligence under the Jones Act and for negligence and unseaworthiness under the general maritime law. Johnson appeals only the district court's grant of summary judgment to GSF on his claim for negligence under the general maritime law.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, applying the same criteria used by the district court. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003). We may award summary judgment if, viewing all evidence in the light most favorable to the non-movant, the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Estate of Sanders v. United States*, 736 F.3d 430, 435 (5th Cir. 2013); Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "When the burden at trial rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). We may affirm a grant of summary judgment "based on any rationale presented to the district court for

3

No. 14-30422

consideration and supported by facts uncontroverted in the summary judgment record." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 234 (5th Cir. 2010) (internal quotation marks and citations omitted).

## DISCUSSION

In the absence of contrary regulation by Congress, federal courts have authority under the Admiralty Clause of the Constitution to develop federal common law governing maritime claims. *See* U.S. Const. art. III, § 2, cl. 1; *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489–90 (2008); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 360–61, 382 (1959). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–65 (1986) (footnote omitted).

Our court has noted that "[t]he recognized principle of agency law that imposes vicarious liability upon employers for the wrongful acts committed by employees while acting in the course of their employment is well ingrained in the general maritime law." *Stoot v. D & D Catering Serv., Inc.*, 807 F.2d 1197, 1199 (5th Cir. 1987). As stated in *Stoot*, the vicarious liability analysis requires two inquiries: (1) whether the defendant is the employer of the tortfeasor; and (2) whether the tortfeasor committed the tort while acting in the course of his employment. We focus on the first question and find that we need not reach the second question.[1]

As the district court observed, we have not expressly articulated a test for establishing an employment relationship in the context of a claim that the defendant is vicariously liable for negligence under the general maritime law.

---

[1] The district court held that a reasonable jury could find that the rig hands were negligent, and GSF does not appeal that determination.

However, given that our court has imported the general doctrine of vicarious liability from agency law into the general maritime law, *see id.* at 1199, we conclude that it is appropriate to rely on common law principles of agency to determine the employer's identity in the maritime analysis of vicarious liability. In addition, as explained below, some common law principles governing the employment relationship were developed in a maritime context, while others have been held to apply to maritime disputes.

## I.     Agency Law

Under the common law of agency, the existence of an employment relationship hinges on "'the hiring party's right to control the manner and means by which the product is accomplished.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (quoting *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989)). The Supreme Court has observed that "[c]ontrol is probably the most important factor under maritime law" to identify employment relationships, "just as it is under the tests of land-based employment." *United States v. W. M. Webb, Inc.*, 397 U.S. 179, 192 (1970) (footnote omitted). Similarly, our court has held, in the maritime context, that "respondeat superior liability is predicated upon the control inherent in a master-servant relationship." *Barbetta v. S/S Bermuda Star*, 848 F.2d 1364, 1370 (5th Cir. 1988).

Agency law anticipates two common disputes relating to employment: disputes over whether an individual is the "borrowed employee" of another employer; and disputes over whether an individual is an independent contractor or an employee. Neither of these tests squarely fits the facts of Johnson's case: there is no indication that GSF was a borrowing or a lending employer, while at the same time, GSF does not allege that the rig hands were independent contractors. However, these two tests suggest factors relevant to

the analysis of whether GSF formed an employment relationship with the rig hands.

The borrowed servant doctrine, now familiar in agency and tort law, was developed in the admiralty context in *Standard Oil Company v. Anderson*, 212 U.S. 215 (1909). *See Drewery v. Daspit Bros. Marine Divers, Inc.*, 317 F.2d 425, 427 (5th Cir. 1963) (citing *Standard Oil* for the proposition that "[t]he doctrine of imputed negligence applies in admiralty"). "[U]nder the borrowed employee doctrine, an employer will be liable through respondeat superior for negligence of an employee he has 'borrowed,' that is, one who does his work *under his supervision and control*." *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977) (emphasis added); *see also Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 455 (5th Cir. 1980) (holding that vicarious liability hinged on "whether, at the moment [the tortfeasor] was doing the work that led to [the] injury, he was acting in the business of and under the control of" the general or borrowing employer). To assess "control" under the borrowed servant doctrine, the Supreme Court has suggested consideration of "the power of substitution or discharge, the payment of wages, and other circumstances bearing upon the relation." *Standard Oil Co.*, 212 U.S. at 225. Relying on *Standard Oil*, we have articulated nine factors that courts should consider in determining whether an employee is a borrowed employee, including: "[w]ho has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation;" "[w]hose work is being performed;" "[w]ho furnished tools and place for performance;" "[w]ho had the right to discharge the employee;" and "[w]ho had the obligation to pay the employee." *Gaudet*, 562 F.2d at 355 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969)); *see also Jackson v. Total E & P USA, Inc.*, 341 F. App'x 85, 86–87 (5th Cir. 2009).

Other maritime disputes have focused on whether a party is an employee or an independent contractor. The Second Restatement of Agency lists factors

distinguishing employees from independent contractors, including "the extent of control which, by the agreement, the master may exercise over the details of the work;" "whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;" and "whether or not the parties believe they are creating the relation of master and servant." Restatement (Second) of Agency § 220(2). The Court of Claims applied the Second Restatement's factors in the maritime context, in a case cited with approval by the Supreme Court. *See Cape Shore Fish Co. v. United States*, 330 F.2d 961, 964 n.5, 965 n.6 (Ct. Cl. 1964); *W. M. Webb, Inc.*, 397 U.S. at 182, 192 & n.17.

Indicia of the employer-employee relationship are also listed in an Internal Revenue Service regulation that the Supreme Court described as "a summary of the principles of the common law" and as sufficiently flexible to apply to the maritime context. *W. M. Webb, Inc.*, 397 U.S. at 193–94. Then and now, the regulation provides:

> Generally such [an employment] relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. . . . The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services.

26 C.F.R. § 31.3306(i)–1(b) (2015); 26 C.F.R. § 31.3121(d)–1(c)(2) (1970). Similarly, in analyzing employment relationships under anti-discrimination statutes, we have articulated the "common law control test" as hinging on "whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee." *Muhammad v. Dall. Cnty. Cmty. Supervision*

No. 14-30422

*& Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007) (internal quotation marks and citation omitted).

With these factors in mind, we examine the relationship between GSF and the rig hands whose negligence allegedly caused Johnson's injuries. Bradley A. McKenzie, global payroll manager for Transocean Offshore Deep Water Drilling, Inc. ("TODDI"), testified that GSF "is an entity that . . . the [TODDI] payroll department uses as a payroll company to distribute pay to . . . U.S. workers working internationally." McKenzie stated that, to his knowledge, GSF has no function other than "payroll." Similarly, Heather G. Callender, assistant secretary of GSF, stated in an affidavit: "[GSF] serves as a 'paymaster' for some expatriate employees. Its primary function is payroll. It does not perform services involving or related to security, protection, maintenance or safety on rigs." In its brief, GSF acknowledges that, in addition to providing payroll services, it "assists with immigration issues if they arise."

C. Stephen McFadin, GSF's president, stated in a declaration that GSF does not engage in any of the following: "operate rigs on a day to day basis;" "perform the day to day supervision and direction of the crew on a rig;" "enter into drilling contracts;" or "charter rigs." A declaration by Emeka Ochonogor, principal rig manager for Transocean Support Services Nigeria Limited ("TSSNL"), stated that GSF "had nothing to do with the day-to-day operations of the HIGH ISLAND VII, and nothing to do with the day-to-day supervision or direction of the HIGH ISLAND VII's crew." Rather, Ochonogor said, "All the crew working on the HIGH ISLAND VII reported directly to one of the TSSNL rig managers working out of the Lagos office. TSSNL supervised the day-to-day operation of the HIGH ISLAND VII, including the crew on the rig."

The record reflects that in 2010, GSF issued W-2 forms to the following four individuals who worked on the HIGH ISLAND VII: Timothy Ashley, Danny Ball, James Robertson, and Jeffrey James. The W-2 forms of all four

workers listed GSF as their "employer," with an address of 4 Greenway Plaza in Houston, Texas. Ashley and Ball were responsible for security aboard the rig, and Ashley, the offshore installation manager, gave the rig hands day-to-day instructions. Johnson highlights testimony by James, the chief mechanic, that he received training at 4 Greenway Plaza, the address listed for GSF on several W-2 forms. Reading James's testimony in the light most favorable to Johnson, we infer that GSF trained James.

The record contains no evidence of most of the factors that would support a finding of an employment relationship. There is no evidence that GSF had the right to direct the rig hands or to control the details of their work. *See W. M. Webb, Inc.*, 397 U.S. at 189; *Gaudet*, 562 F.2d at 355; Restatement (Second) of Agency § 220(2)(a). There is no evidence that GSF hired or had the right to fire the rig hands. *See W. M. Webb, Inc.*, 397 U.S. at 193; *Standard Oil Co.*, 212 U.S. at 225; *Muhammad*, 479 F.3d at 380; *Gaudet*, 562 F.2d at 355. There is also no evidence that GSF furnished the rig or the equipment used on the rig. *See Gaudet*, 562 F.2d at 355; Restatement (Second) of Agency § 220(2)(e). Although it would be reasonable for the rig hands to assume that they were GSF employees based on their W-2 forms, none of the rigs hands so testified. Rather, James stated that he worked for "Transocean." Robertson said he believed his employer was based out of Houston, but did not identify his employer as GSF. James and Robertson testified that they did not believe GSF had "anything to do with the day-to-day operation" of the rig, and Ball testified that he believed Transocean controlled the day-to-day operation of the rig.

The only evidence favoring Johnson is that GSF paid the rig hands, that GSF is identified as the rig hands' "employer" on their W-2 forms, that GSF assisted with immigration matters, and that GSF trained the rig's chief mechanic. We must therefore decide whether a reasonable jury, based on these facts, could find that GSF and the rig hands created an employment

relationship that would support vicarious liability under the general maritime law.[2] Control is "the most important factor" in identifying an employment relationship under the general maritime law, *W. M. Webb, Inc.*, 397 U.S. at 192, especially where, as here, the plaintiff seeks to impose vicarious liability. *See Barbetta*, 848 F.2d at 1369–70. While payment of wages is relevant to control, it is not dispositive. *See Standard Oil Co.*, 212 U.S. at 225 ("[T]he payment of wages, and other circumstances bearing upon the relation . . . are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control."). Absent from the record are other indicia of control, such as the right to supervise the rig hands or set their schedule, the right to hire or fire, and the provision of the place or instrumentalities of work. Given that there is little or no evidence of control, no reasonable jury could find that GSF employed the rig hands, applying common law principles of agency.

## II.    The Jones Act

Johnson argues that we should consult caselaw applying the Jones Act to determine whether an employment relationship exists for purposes of assigning vicarious liability under the general maritime law. The Jones Act "create[s] a negligence cause of action for ship personnel against their employers." *Withhart v. Otto Candies, L.L.C.,* 431 F.3d 840, 843 (5th Cir. 2005); *see also* 46 U.S.C. § 30104. While vicarious liability hinges on an employment relationship between the defendant and tortfeasor, liability under the Jones Act depends on an employment relationship between the plaintiff-seaman and the defendant. *See Guidry*, 614 F.2d at 452.

---

[2] The district court held that GSF was a mere "paymaster," and that a "paymaster" is not an employer under the general maritime law. On appeal, Johnson argues that the district court did not adequately define "paymaster," and GSF concedes that "the name [paymaster] is irrelevant." We do not explore whether GSF should be labelled a "paymaster," but rather focus on the facts of GSF's relationship with the rig hands.

No. 14-30422

Jones Act cases may be useful to our analysis to the extent that these cases articulate common law principles. Our court has stated that "the common law's limits on employer liability are entitled to great weight in . . . Jones Act cases, subject to such qualifications as Congress has imported into those terms." *Beech v. Hercules Drilling Co.*, 691 F.3d 566, 571 (5th Cir. 2012) (internal quotation marks and citation omitted). Indeed, several of the factors that our court has cited in Jones Act cases to identify employment relationships are also relevant under the common law. *See Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 177–78 (5th Cir. Unit A Sept. 1981) (applying the borrowed servant doctrine under the Jones Act); *see also Volyrakis v. M/V Isabelle*, 668 F.2d 863, 866 (5th Cir. 1982) ("Control is the critical inquiry [under the Jones Act]. Factors indicating control over an employee include payment, direction, and supervision of the employee. Also relevant is the source of the power to hire and fire."), *overruled on other grounds by In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147 (5th Cir. 1987).

However, Jones Act caselaw should not control our analysis to the extent that it departs from common law principles of agency. The Supreme Court has held that the Jones Act "is entitled to a liberal construction to accomplish its beneficent purposes"—to "provide for the welfare of seamen." *Cox v. Roth*, 348 U.S. 207, 210 (1955) (internal quotation marks and citation omitted). "Liberal construction is necessary because of the seaman's broad and perilous job duties." *Beech*, 691 F.3d at 570. We have cited the requirement of liberal construction in identifying employment relationships under the Jones Act. *See Guidry*, 614 F.2d at 455 ("The Jones Act is remedial legislation and as such should be liberally construed in favor of injured seamen." (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224 (5th Cir. 1975), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997)). "This

11

liberal construction has resulted in broader employer liability under the Jones Act . . . than would have been possible under the common law." *Beech*, 691 F.3d at 571; *see also Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790 (1949) ("assum[ing] without deciding that . . . the rules of private agency should not be rigorously applied" to identify employment relationships under the Jones Act). The requirement of liberal construction limits the usefulness of Jones Act cases in determining vicarious liability under the general maritime law, where our court has expressly adopted agency law. *See Stoot*, 807 F.2d at 1199 (noting that the vicarious liability doctrine from agency law is "well ingrained in the general maritime law"). Indeed, we have noted that "while the determination of vicarious liability is related to determining whether a defendant is an employer under the Jones Act, they are not assayed by identical standards." *Guidry*, 614 F.2d at 455.

The Jones Act case on which Johnson primarily relies is *Spinks v. Chevron Oil Company*. There, we held that an employee of Labor Services, Inc., who was injured while performing work for Chevron Oil Company, could sue Labor Services under the Jones Act for compensation for negligence. *Spinks*, 507 F.2d at 218. We held that although Spinks was a "borrowed employee" of Chevron, he also remained an employee of Labor Services, whose business included "the supplying of laborers to work on oil rigs and drilling barges." *Id.* at 220. As evidence that Spinks was an employee of Labor Services, we noted that Labor Services hired Spinks; Labor Services paid Spinks and withheld taxes and social security payments from his salary; a Labor Services employee could fire Spinks; and Labor Services made a profit from Spinks's work. *Id.* at 224–25. In *Guidry*, our circuit described the *Spinks* analysis:

> Spinks sued the company that had hired him and signed his checks, his payroll employer. This company in turn assigned him to do work with another firm . . . . In that context, we focus on whether the payroll employer has divested itself of all control over

the employee. Unless this has happened, the employee is entitled to look no further than the signature on his check.

*Guidry*, 614 F.2d at 454. Relying on *Spinks* and *Guidry*, Johnson argues that GSF is the rig hands' "payroll employer" and is therefore vicariously liable for their negligence even in the *absence* of evidence of control. Johnson suggests that the burden is on GSF to prove that it has "divested itself of all control" over Johnson.

As a threshold matter, we decline to shift the burden to GSF to demonstrate a lack of control. Such a rule would conflict with caselaw holding that vicarious liability hinges on control, and that payment of wages is relevant, but not dispositive, in determining control. *See Standard Oil Co.*, 212 U.S. at 225; *Barbetta*, 848 F.2d at 1370–71. In addition, we note that *Spinks* is distinguishable on its facts. First, the evidence of an employment relationship is stronger between Spinks and Labor Services than between the rig hands and GSF. In contrast to the relationship between Spinks and Labor Services, there is no evidence that GSF hired the rig hands or that a GSF employee could fire the rig hands. Second, the panel in *Spinks* appeared to assume that Labor Services was Spinks's original employer. The question was not whether Spinks and Labor Services had ever formed an employment relationship, but rather whether Labor Services ceased to be Spinks's employer, under the Jones Act, because it had assigned Spinks to work on Chevron's drilling barge. By contrast, there is no evidence that GSF ever formed an employment relationship with the rig hands. For both legal and factual reasons, Johnson's reliance on *Spinks* is inapposite.

## III.   Johnson's Additional Arguments

Johnson raises three additional arguments to support his position that GSF employed the rig hands. First, he notes that in two other lawsuits, GSF admitted to being an employer of other rig hands in 2008. Although Johnson

claims that one of these employees worked on the HIGH ISLAND VII, he points to no record evidence to support that claim. Evidence that GSF employed some rig hands in 2008 does not raise an inference that GSF employed the rig hands who were working on the HIGH ISLAND VII on the night of November 8, 2010.

Second, Johnson suggests that there is insufficient record support for GSF's claim that TSSNL was the rig hands' employer. However, because Johnson bears the burden at trial of demonstrating an employment relationship between GSF and the rig hands, GSF carries its burden at the summary judgment stage by pointing to an absence of evidence that it employed the rig hands. *See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 199 F.3d at 798. GSF need not prove that another entity employed the rig hands.

Finally, Johnson marshals policy arguments. He claims that a finding that TSSNL, and not GSF, employed the rig hands would lead to "a situation in which overseas rig hands will now fluctuate wildly in and out of employment relationships based merely upon where the rig is operating." However, on this record, the situation that Johnson fears might actually result from a finding that GSF employed the rig hands. McKenzie testified that while GSF distributes pay to Americans working on rigs in non-U.S. waters, Transocean Deep Water, Inc. distributes pay to Americans working on rigs in U.S. waters. Therefore, allowing the identity of the rig hands' employer to hinge on the W-2 form could cause employment relationships to change each time a rig moved between U.S. and non-U.S. waters.[3]

---

[3] At the same time, we acknowledge concern that companies conceivably could delegate through contract each obligation reflecting an employment relationship, such that no one company exercises sufficient control over a tortfeasor to support vicarious liability.

No. 14-30422

## CONCLUSION

GSF may not be held vicariously liable for the rig hands' alleged negligence because no reasonable jury could find an employment relationship between GSF and the rig hands. We therefore AFFIRM the district court's grant of summary judgment in favor of GSF.